674 A.2d 1085

**SOVEREIGN BANK and New Home Financial Services, Inc.**

v.

**Richard A. HARPER, Dianne C. Harper, and Robert J. Carey**

**Appeal of Robert J. CAREY.**

**SOVEREIGN BANK and New Home Financial Services, Inc.**

v.

**Richard A. HARPER, Dianne C. Harper and Robert J. Carey**

**Appeal of Richard A. HARPER and Dianne C. Harper.**

Superior Court of Pennsylvania.

Argued Sept. 28, 1995.

Filed March 7, 1996.

Reargument Denied May 16, 1996.

580

Robert J. Carey, West Chester, in propria persona (at 4235) and for appellants (at 412).

Daniel B. Huyett, Reading, for appellee.

Before KELLY, JOHNSON and CERCONE, JJ.

CERCONE, Judge:

This is an interlocutory appeal and cross-appeal as of right from an order which granted a preliminary injunction and directed a Revocation of Deed to be stricken. *See* Pa.R.A.P., Rule 311(a)(4), 42 Pa.C.S.A. (interlocutory appeals from orders granting injunctions). We affirm.

The instant case had its inception in November of 1988 when plaintiff/appellee Sovereign Bank (Sovereign) made a loan in the sum of $2,775,000.00 to Quail Run Homes, Ltd. (Quail Run), a Pennsylvania corporation. Defendant/appellant Richard A. Harper was the sole shareholder of Quail Run, a residential subdivision located in Franklin Township, Chester County, Pennsylvania. Mr. Harper and his wife, defendant/appellant Dianne C. Harper, both signed a written agreement with Sovereign to act as sureties for the Quail Run loan. The Harpers' suretyship obligations were secured by second mortgage liens on nine separate tracts of land. These premises (the Turkey Hill properties), are subject to leases with Turkey Hill Minit Markets, Inc. and all are used for running convenience stores. The Turkey Hill properties are located in five different Pennsylvania counties: Berks, Lancaster, York, Lebanon and Dauphin. Before the suretyship agreement was signed, these properties had been encumbered by a blanket first lien mortgage with an outstanding balance of more than $700,000.00 in favor of Elverson National Bank. *See* Trial Court Opinion dated January 24, 1995, docketed January 25, 1995 at 2–5 (factual findings 1–7).

The subdivision at Quail Run was not as financially successful as the parties had hoped. In order to avoid defaulting on the loan with Sovereign, Mr. Harper auctioned all unsold lots at Quail Run on April 3, 1993. Later that month, the Harpers and Sovereign entered into a written loan modification agreement with a subsequent amendment which was signed on May 24, 1993. Defendant/appellant Robert J. Carey, Esquire, represented the Harpers during their loan renegotiations with Sovereign. The written loan modification agreement provided, *inter alia*, that Mr. Harper would pay over the net proceeds of the Quail Run auction sale to Sovereign. Pursuant to the amendment, the Harpers executed "deeds in lieu of foreclosure" for the Turkey Hill properties. The deeds named appellee New Home Financial Services (New Home), Sovereign's wholly owned subsidiary, as the "designated grantee."

The Harpers delivered the deeds to Sovereign to be held in escrow until Sovereign could properly investigate the Turkey Hill properties and determine whether environmental problems existed, and whether there was pending litigation or some other defect of title. Sovereign agreed to release the Harpers from any further liability if they complied with all of the terms and conditions of the original loan modification agreement signed on April 27, 1993 and the May 24th amendment. These agreements also indicated that upon delivery of the deeds in lieu of foreclosure to Sovereign or its designated grantee, the Harpers were to have no further right, title or interest in or to the deeds or any right to control the use or disposition of the properties by either Sovereign or New Home. *Id.* (factual findings 8–15).[1]

1. The amendment signed May 24, 1993 specifically states that if Sovereign's investigation disclosed unsatisfactory information concerning title, environmental impact or other problems, Sovereign could direct the escrow agent to return one or more of the "deeds in lieu of foreclosure" to the Harpers. In the event Sovereign directed any deed to be returned, the Harpers would take title to the property therein described and the "deed in lieu of foreclosure" would be null and void with respect to that property. The agreement also explicitly provides that delivery of any deed from the escrow agent to Sovereign, or to Sovereign's designated grantee, would vest title solely in Sovereign or the grantee. Plaintiff's Exhibit No. 2 at 3–4, ¶ A–4(b).

On September 9, 1994, Paul J. Schmidt, entered into an agreement of sale with Sovereign to purchase the nine Turkey Hill properties for the price of $1,080,000.00.[2] Settlement was scheduled for 9:30 a.m. on November 23, 1994, the day before the Thanksgiving holiday. However, approximately forty-five minutes before the closing, Attorney Carey telephoned counsel for Sovereign and New Home to say that on the previous day he had recorded a "Revocation of Deed" for each of the nine Turkey Hill properties. Not surprisingly, the purchaser's title insurance company refused to issue title insurance coverage for any of the nine properties. The buyer thereupon declined to proceed with settlement.[3] Mr. Schmidt also threatened to exercise the rescission clause in the agreement of sale if the cloud to marketable title could not be quickly cleared. *Id.* (factual findings 16–22).

> Testimony was presented at the hearing indicating that Mr. Carey actually violated the terms of the written agreements between the Harpers and Sovereign by delivering the deeds in lieu of foreclosure directly to Sovereign rather than honoring the terms of the escrow agreement. N.T. 12/9/94 at 96–97, 102 (testimony of Steven Douglas Buck). Thus, the evidence supports the inference that Mr. Carey had actual knowledge that the deeds to the Turkey Hill properties were in the possession of Sovereign and that the Harpers' rights were extinguished. *See also id.* at 61–65, 67 (testimony of Beth Ann Moore indirectly corroborating Mr. Buck's statements concerning the escrow arrangements). Mr. Carey presented no contrary evidence at the hearing.

2. A portion of the purchase price was to be applied in satisfaction of Elverson National Bank's first lien mortgage. Sovereign expected to realize approximately $280,000 while the Harpers would receive roughly $620,000.00 in loan forgiveness. N.T. 12/9/94 at 66–68.

3. Andrew Monastra, Esquire, Executive Vice–President for Sentry Abstract Company and an experienced real estate attorney, testified that he had never heard of a "Revocation of Deed" on the date of the aborted closing. N.T. 12/9/94 at 78. He therefore contacted an underwriter at Commonwealth Land Title, a firm with over one hundred years of experience in the field. *Id.* Upon consultation with Commonwealth's home office, the underwriter could find nobody who was familiar with this type of filing. However, Commonwealth's position was that a "Revocation of Deed" constituted a defect rendering title uninsurable and unmarketable. *Id.* at 78–79. Based on his conversation with the Commonwealth underwriter, and his reading of the revocation documents, Mr. Monastra concluded that the title to the Turkey Hill properties could not be insured as "good and marketable." *Id.* at 79, 92–95.

The following Wednesday, November 30, 1994, Sovereign and New Home commenced the action underlying this appeal by filing a complaint in equity with an accompanying motion requesting injunctive relief against the Harpers and Mr. Carey. The filings specifically sought protection from any interference with the sale of the Turkey Hill properties. The lower court's docket indicates that on that date, the Honorable Scott D. Keller, acting on behalf of the Honorable Thomas J. Eshelman, scheduled a preliminary injunction hearing for December 5, 1994. Judge Keller issued a Rule Returnable which assigned the matter to the Honorable Frederick Edenharter. The Rule also directed Mr. Carey either to disclose the Harpers' address within five hours of his receipt of the complaint, or to accept service of the complaint on behalf of the Harpers. Rule Returnable dated 11/30/94. Additionally, Judge Keller granted appellees permission to serve the Harpers by Federal Express instead of certified mail if Mr. Carey chose to reveal their location rather than accept service on their behalf. *Id.*[4]

On December 5, 1994, Judge Edenharter recused. The hearing on the preliminary injunction was rescheduled for

---

4. The transcript from the preliminary injunction hearing indicates that Mr. Carey did not comply with Judge Keller's order, and that he refused to disclose the Harpers' location. N.T. 12/9/94 at 12. The Harpers have no permanent residence in Pennsylvania, and they moved from their last known address without notifying either Sovereign or New Home of a forwarding address. *Id.* at 16–17. Although the Harpers executed the Revocation of Deed in Buncombe County, North Carolina, the document lists Mr. Carey's law offices at "780 Market Street, Suite 280, West Chester, PA 19382" as the "address of the Declarants." *See* Exhibit 15 at 3. The Harpers actually reside in Charleston, *South* Carolina, not in West Chester, Pennsylvania or Buncome County, *North* Carolina.

Counsel for Sovereign was unable to learn the proper location for service on the Harpers until December 5, 1994, the date originally set for the preliminary injunction hearing. *Id.* The certified record contains a certificate of service indicating that on December 7, 1994, the Harpers were personally served in Charleston, South Carolina with a copy of the complaint, the motion for preliminary hearing, the order scheduling the hearing, and a notification of the rescheduled hearing date of December 9, 1994. The certificate of service further indicates that the Harpers were also served with all of the above documents by Federal Express and by certified mail on December 5, 1994. *See* Certificate of Service filed 12/8/94, docketed 12/9/94.

December 9, 1994 and the case was reassigned to the Honorable Albert A. Stallone. *See* orders docketed 12/5/94 and 12/6/94. When the hearing convened on the 9th, Mr. Carey indicated that he had spoken with the Harpers on an unspecified date, and that they did not intend to come to Pennsylvania from South Carolina unless it was "necessary." N.T. 12/9/94 at 8–9. Mr. Carey also stated that the Harpers had agreed to authorize him to act on their behalf, but only if plaintiffs permanently dismissed him as a party defendant. *Id.* at 9–10. Sovereign and New Home declined to permanently dismiss Mr. Carey, who would not accede to a temporary dismissal "without prejudice." *Id.* at 13–14.

Judge Stallone considered the fact that the plaintiffs' difficulties in effectuating service were initially created by the Harpers' failure to notify their mortgage holder, Sovereign, of their forwarding address. This problem was compounded when Mr. Carey refused to comply with Judge Keller's order and disclose the Harpers' whereabouts. Furthermore, neither Mr. Carey nor the Harpers had notified the court that the Harpers would not be present and had not retained new counsel. In light of these circumstances, because several witnesses were waiting to testify, and also because he had deliberately rearranged the court's calendar to accommodate the preliminary injunction hearing, Judge Stallone decided to proceed in order to develop an understanding of the issues at stake in the case. *Id.* at 9, 15–17, 136–37.

When the hearing concluded shortly after 4:00 p.m. that Friday afternoon, Judge Stallone stated that the evidence clearly supported Sovereign's petition. N.T. 12/9/94 at 137–38. Consequently, he ruled, on the record, that the motion for preliminary injunction was granted. *Id.* The chancellor deliberately postponed drafting and entering any written order so that he could conduct a conference with the parties after they had an opportunity to consider and recommend language that would fully explain the obligations to be imposed. *Id.* at 138–147. Nevertheless, Judge Stallone extensively discussed the parameters which he considered necessary for any such order. *Id.* Furthermore, Judge Stallone explicitly directed

Mr. Carey not to "interfere in any way" with the properties and to do nothing affecting the case until after the conference. *Id.* at 142. The trial court scheduled the conference for 11:30 a.m. on the next business day, Monday December 12, 1994. *Id.* at 143. The transcript clearly indicates that the late morning time was selected for Mr. Carey's convenience. *Id.*

Despite the unequivocal instructions of the trial judge to refrain from impairing in any way the rights of Sovereign or New Home, early on the morning of December 12th, Mr. Carey filed a summons initiating a companion law suit on behalf of the Harpers. N.T. 12/12/94 at 5. The action named Sovereign, New Home, and Sovereign's counsel as party defendants. *Id.* When the conference convened, Mr. Carey informed Judge Stallone of this fact, and also stated that he had filed a praecipe for lis pendens.[5] *Id.* Mr. Carey did not specify whether praecipes had been filed in each county where Turkey Hill property is located or whether the filings only occurred in Berks County.

Judge Stallone duly considered this new problem and determined that it did not change the outcome of the issues before the court because his ruling on the preliminary injunction was operative when orally promulgated at the hearing conducted December 9th. Thereupon Judge Stallone entered the following written order setting forth the terms of the preliminary injunction:

> AND NOW, this 12th day of December, 1994, retroactive and effective as of December 9, 1994, upon consideration of plaintiffs' motion for preliminary injunction and hearing requesting the striking of a Revocation of Deed ("Revocation of Deed") dated November 21, 1994 which identifies the declarants as Richard A. Harper and Dianne C. Harper, his wife, and the properties affected as [the Turkey Hill properties] (the "Properties"), and the response thereto, IT IS

---

[5]. We note that Mr. Carey's conduct in this matter on December 12th directly contradicts his repeated assertions at the December 9th hearing to the effect that he no longer represented the Harpers, that he could not and would not act for them, and that continuing to represent them would be a direct conflict of interest for him. *See, e.g.,* N.T. 12/9/94 at 6, 9–13, 16, 17, 136.

HEREBY ORDERED AND DECREED that plaintiffs' motion is GRANTED.

IT IS FURTHER ORDERED THAT:

1. Defendants Richard A. Harper and Dianne C. Harper shall by December 16, 1994 cause to be withdrawn and stricken the Revocation of Deed filed in Berks, Lancaster, York, Lebanon and Dauphin Counties;

2. Upon the filing of this Order in the Recorder of Deeds Offices of Berks, Lancaster, York, Lebanon and Dauphin Counties or any other appropriate office or place, the Revocation of Deed attached hereto shall be deemed stricken and cancelled and shall have no further force or effect at any time thereafter;

3. Defendants Richard A. Harper, Dianne C. Harper and Robert J. Carey are enjoined from taking any action to cloud plaintiffs' title to the Properties or to interfere with the sale of the Properties; and

4. This order shall be binding on the parties until further Order of Court.

Plaintiffs shall post a surety bond (or check in lieu of bond) in the amount of $500 within two days of this order.

Order dated and docketed 12/12/94 (the specific addresses of the Turkey Hill properties have been omitted).[6] Mr. Carey made an oral motion for a supersedeas pending appeal, which the trial court denied. Finally, Judge Stallone indicated on the record that Mr. Carey's conduct in this matter was subject to sanctions. *Id.* at 6–7.

Mr. Carey immediately filed a notice of appeal to the Superior Court, accompanied by an emergency petition for supersedeas and suspension of injunction. This court denied the motion on December 14, 1994. The Harpers subsequently filed a separate timely notice of appeal.[7] Appellants present

6. We note that the trial court docket incorrectly shows the order's effective date as December 3, 1994 rather than December 9, 1994.

7. Mr. Carey and the Harpers have not filed separate briefs. The appellants' brief in this case was prepared and filed by Mr. Carey for the Harpers and on his own behalf.

two issues for our consideration: (1) whether the trial court erred as a matter of fact and law in granting the mandatory preliminary injunction; and (2) whether the trial court erred in declaring the preliminary injunction to be "retroactive" in order to preempt the action commenced on December 12, 1994 on behalf of the Harpers.

As an initial point, we note that an appellate court's review of the grant or denial of a preliminary injunction is limited to a determination of whether any apparently reasonable grounds existed for the action taken by the trial court; appellate courts will not review the merits of the controversy itself. *Willman v. Children's Hospital of Pittsburgh*, 505 Pa. 263, 269, 479 A.2d 452, 454 (1984). The Superior Court may interfere with the chancellor's decision regarding a preliminary injunction only if the certified record reveals that no grounds exist to support the decree, or that the rule of law relied upon was either palpably erroneous or misapplied. *Coatesville Development Company v. United Food Workers*, 374 Pa.Super. 330, 337, 542 A.2d 1380, 1384 (1988) (*en banc*).

In order to sustain a preliminary injunction, *the plaintiff's right to relief must be clear, the need for relief must be immediate, and the injury must be irreparable if the injunction is not granted.*

*Willman, supra* (emphasis in original; citations omitted). An injury is "irreparable" if it cannot adequately be compensated by money damages. *New Castle Orthopedic Associates v. Burns*, 481 Pa. 460, 463–64, 392 A.2d 1383, 1385 (1978).[8]

8. We are cognizant of appellants' argument that the chancellor erred by applying the standard our Supreme Court promulgated in *Shenango Valley Osteopathic Hospital v. Department of Health*, 499 Pa. 39, 451 A.2d 434 (1982) rather than the version set forth by the Superior Court in *Rollins Protective Services Company v. Shaffer*, 383 Pa.Super. 598, 557 A.2d 413 (1989) and *Blair Design and Construction Co., Inc. v. Kalimon*, 366 Pa.Super. 194, 530 A.2d 1357 (1987). We cannot agree with this contention. First, the trial courts of this Commonwealth are certainly entitled to rely upon the decisions of our Supreme Court. Second, the standard of review as explained in these Superior Court cases is essentially the same as that contained in *Shenango, supra*. The only difference is that these particular Superior Court decisions treat the Supreme Court's definition of "irreparable injury" as a separate and explicit requirement which must be proved by the plaintiff. This

The preliminary injunction set forth above contains both prohibitory and mandatory provisions. The long-standing law of this Commonwealth recognizes the propriety of employing a mandatory injunction as a preventive remedy. *See, e.g., Audenried v. Philadelphia & R.R. Co.*, 68 Pa. 370 (1871); *Appeal of Brown*, 62 Pa. 17 (1869); *Appeal of Mammoth Vein Consolidated Coal Co.*, 54 Pa. 183 (1867). Because a mandatory injunction compels the defendant to perform an act, rather than merely refraining from acting, courts will only grant a mandatory injunction upon a very strong showing that the plaintiff has a "clear right" to relief. *Roberts v. Board of Directors of the School District of Scranton*, 462 Pa. 464, 469–70, 341 A.2d 475, 478 (1975); *Trainer v. International Alliance of Theatrical Stage Employees & Moving Picture Machine Operators of U.S. and Canada, Local No. 516, of Chester*, 353 Pa. 487, 491, 46 A.2d 463, 465 (1946). However, this does not mean that the party seeking a mandatory preliminary injunction must establish his or her claim absolutely. *Shenango Valley Osteopathic Hospital v. Department of Health*, 499 Pa. 39, 51, 451 A.2d 434, 440 (1982). Pennsylvania law places the burden upon the party seeking an injunction to establish his or her own rights as well as the inequitable nature of the defendant's conduct. *Straup v. Times Herald*, 283 Pa.Super. 58, 68, 423 A.2d 713, 718 (1980). Nevertheless, the defendant must show that his or her conduct was reasonable or that a defense exists to the plaintiff's claims. *Dougherty v. Pennypack Woods Home Ownership Association*, 181 Pa.Super. 121, 126, 124 A.2d 703, 705–06 (1956).

The record certified to this court shows that the chancellor was fully apprised of the enhanced standard applicable to mandatory injunctions and of the petitioners' burden of proof in this regard. *See* N.T. 12/9/94 at 43–44, 116, 131. Mindful of the applicable scope and standard of review, we have

distinction is irrelevant, however, because the pertinent Supreme Court cases clearly indicate that the plaintiff must demonstrate that money damages will provide inadequate recompense. *See, e.g., New Castle Orthopedic Associates v. Burns, supra.* We note, furthermore, that the chancellor was well aware of this requirement and discussed it at the preliminary injunction hearing. N.T. 12/9/94 at 130–132.

carefully examined the record in conjunction with the chancellor's explanation of why he granted the petition for an injunction. For appellants' benefit, we shall briefly address each of the elements which are necessary in order to justify the grant of injunctive relief.

Appellees presented substantial evidence that all rights pertaining to the Turkey Hill properties had been conveyed to Sovereign's designated grantee, New Home, pursuant to the loan modification agreements signed by the Harpers. *See* N.T. 12/9/94 at 18–74; Exhibits 3–11 (deeds conveying the Turkey Hill properties from the Harpers to New Home Financial Services, Inc.). Beth Ann Moore, Vice-President of Sovereign's Commercial Loan Department, testified that the purpose of the loan modification agreements was to permit Sovereign to salvage as much as it could from the failed real estate subdivision at Quail Run and to provide the Harpers with a release of any further liability to the bank. N.T. 12/9/94 at 67–69. According to Ms. Moore, the inducement to the Harpers to convey the Turkey Hill properties rather than forcing Sovereign to foreclose on them was substantial, involving roughly $620,000 in personal loan forgiveness. *Id.* at 68.

By way of contrast, appellants made no effort at the hearing to refute appellees' evidence. On appeal, they have stressed the fact that appellees' claim to title is weak because the deeds to the Turkey Hill properties were never recorded. However, recording a deed is not essential to establish its validity; title to real estate may be passed by delivery of the deed without recording it. *Matter of Pentrack's Estate,* 486 Pa. 237, 240, 405 A.2d 879, 880 (1979); *Fiore v. Fiore,* 405 Pa. 303, 174 A.2d 858 (1961). In light of all the pertinent evidence, we conclude that the chancellor properly found that appellees demonstrated a "clear right" to relief within the meaning of the enhanced requirements concerning mandatory injunctions.

The next question is whether appellees' need for relief was "immediate." The certified record shows that the terms

of the agreement of sale did not require Mr. Schmidt to purchase the Turkey Hill properties unless Sovereign and New Home could convey "good and indefeasible title," valid of record, and insurable by the title insurance company of the buyer's choice. *See* Exhibit 12 ¶ 3(a) (agreement of sale dated 9/9/94). Testimony indicated that if the title defect could not be cured quickly, Mr. Schmidt intended to exercise his legal rights, cancel the agreement of sale, and "do something else with [his] money." N.T. 12/9/95 84. This evidence is sufficient to support the chancellor's determination that appellees needed an immediate resolution for their impasse with the Harpers.

 Our final inquiry is whether appellees would suffer an "irreparable injury" if the chancellor refused to grant a preliminary injunction. An injury is regarded as "irreparable" if it will cause damage which can be estimated only by conjecture and not by an accurate pecuniary standard. *Boehm v. University of Pennsylvania School of Veterinary Medicine*, 392 Pa.Super. 502, 522, 573 A.2d 575, 586, *appeal denied*, 527 Pa. 596, 589 A.2d 687 (1990). *See John G. Bryant Co. v. Sling Testing and Repair, Inc.*, 471 Pa. 1, 8, 369 A.2d 1164, 1167 (1977) (plaintiff may establish "irreparable" harm by proving the likelihood of a loss that is not entirely ascertainable and hence compensable by money damages). For purposes of a preliminary injunction, harm must be irreversible before it will be deemed "irreparable." *Boehm, supra.*

 Pennsylvania courts sitting in equity have jurisdiction to prevent the continuance of acts prejudicial to the interest of individual rights, including the authority to enjoin wrongful breaches of contract where money damages are an inadequate remedy. *Straup v. Times Herald*, 283 Pa.Super. at 68, 423 A.2d at 718. In the commercial context, the impending loss of a business opportunity or market advantage may aptly be characterized as an "irreparable injury" for this purpose. For example, in the case of *John G. Bryant Co. v. Sling Testing and Repair, Inc., supra,* our Supreme Court

approved a preliminary injunction enforcing an anticompetitive employment covenant on the grounds that the alleged interference with customer relationships would be "irreparable" because the extent of the injury was inherently unascertainable, and hence incapable of being fully compensated by money damage. Likewise, in *Courier Times, Inc. v. United Feature Syndicate, Inc.,* 300 Pa.Super. 40, 445 A.2d 1288 (1982), this court held that a newspaper would suffer irreparable injury by being deprived of a popular syndicated feature. The Superior Court found that loss of the "Peanuts" comic strip would hamper efforts to compete for the business of the customers of a defunct publication. The loss was considered irreparable as the number of lost customers could not be accurately tabulated.

The evidence discussed above shows that in the instant case, Mr. Schmidt intended to cancel the agreement of sale for the Turkey Hill properties if appellees could not provide him with clear title in the very near future. Appellants are correct in their contention that the potential profit, and hence the possible loss, on this particular real estate deal are both readily calculable. However, that is not the only issue at stake. The testimony presented at the hearing indicated that the Turkey Hill Properties are "questionable" investments in that they have been subjected to serious environmental contamination. N.T. 12/9/94 at 35, 105, 109, 113. At least one of these parcels is already the focus of pending environmental litigation while another is a likely candidate for suit because it contains a structure improperly located over a sewer line. *Id.* at 35. Moreover, all of the properties are subject to long-term leases with terms which are extremely unfavorable to the land owner/lessor. *Id.* at 31–32. Despite almost two years of aggressively attempting to market the properties, Sovereign had located no prospective buyer (other than Mr. Schmidt) who was willing to accept these serious drawbacks, prepared to rectify the environmental damage, and willing to pay a reasonable approximation of the appraised value for the land.

*Id.* at 34–36.[9] Testimony established that Mr. Schmidt was even willing to pay cash for the properties and had imposed no financing contingencies in the agreement of sale. *Id.* at 36. *See* Exhibit 12 (agreement of sale dated 9/9/94).

We find that these factors more than adequately justify the chancellor's conclusion that appellants' behavior would irreparably harm appellees by depriving them of a bona fide market advantage deriving from the agreement of sale with Mr. Schmidt. Sovereign clearly wanted to take advantage of the business opportunity presented by Mr. Schmidt's offer thereby limiting its liability and ending further losses in connection with the loan to the Harpers. It is simply impossible to calculate the length of time Sovereign might need to search for another buyer willing to accept the drawbacks of the Turkey Hill properties. Moreover, there is no guarantee that Sovereign could ever locate another potential buyer who combines the advantages of offering a reasonable approximation of the appraised value for the land with the ability to handle his own financing and pay cash at the closing. In light of these facts, we find that the chancellor based his decision on reasonable grounds, and that the certified record contains no indication that Judge Stallone either misapplied Pennsylvania law or relied on a palpably erroneous interpretation of our law in reaching his determination. *See Coatesville Development Company v. United Food Workers, supra.*

■ Appellants also contend that the chancellor committed an abuse of discretion and/or an error of law by making the preliminary injunction "retroactive" to a time prior to December 12, 1994, the date on which the written order was entered. We cannot agree that this is a proper characterization of Judge Stallone's actions. First, the chancellor clearly indicated at the close of the hearing held December 9, 1994, that he was granting the relief requested by appellees and that he was issuing a preliminary injunction in favor of Sovereign and New Home. N.T. 12/9/94 at 137–38. As discussed above, Judge

9. Ms. Moore testified that except for Mr. Schmidt, the "level of interest" displayed by potential buyers was "significantly below the appraised values" for the Turkey Hill properties. N.T. 12/9/94 at 34–35.

Stallone explained the terms of the preliminary injunction and discussed the responsibilities of all the parties. *Id.* at 138–47. Although the chancellor deliberately postponed entering a written version of his ruling so that the parties would have an additional opportunity to propose specific language for the order, he left them in no doubt as to their obligations. Moreover, the certified record is quite clear that the written order as entered on December 12, 1994 contained no surprises for the appellants and merely constituted a written expression of the oral ruling issued December 9th.

We note additionally that the Superior Court ordinarily upholds the Court of Common Pleas' power to enter an order retroactively (or *nunc pro tunc*) where the purpose of such an action is to avoid an injustice. *Chapliski v. Churchill Coal Corporation,* 349 Pa.Super. 285, 288, 503 A.2d 1; 3 (1985) (citing *Fitzgerald v. Stewart,* 53 Pa. 343 (1866)). In this case, Judge Stallone explicitly warned Mr. Carey on December 9th to refrain from taking any action which would impair appellees' rights in the Turkey Hill properties and to do nothing further in the matter until after the conference to be held the following Monday morning. N.T. 12/9/94 at 142. To accommodate Mr. Carey, the chancellor scheduled the Monday conference at 11:30 a.m. rather than earlier. Mr. Carey responded by abusing the court's indulgence and disobeying Judge Stallone's instructions. We see no indication that the chancellor erred by drafting his written order in response to Mr. Carey's early morning activities on December 12th and thereby avoiding injustice to appellees.

Order affirmed.