**Charles J. CARLINI, M.D.**

**v.**

**HIGHMARK, d/b/a Highmark Blue Cross Blue Shield, Keystone Health Plan West, Inc., Appellants.**

Commonwealth Court of Pennsylvania.

Argued Feb. 7, 2000.

Decided June 26, 2000.

Reargument and Request for Rehearing Denied Aug. 29, 2000.

David R. Johnson, Pittsburgh, for appellants.

Larry A. Silverman, Pittsburgh, for appellee.

Before McGINLEY, Judge, PELLEGRINI, Judge, and RODGERS, Senior Judge.

McGINLEY, Judge.

Highmark d/b/a Blue Cross Blue Shield (Highmark) and Keystone Health Plan West, Inc. (Keystone) (collectively, Appellants), seek review of the order of the Court of Common Pleas of Allegheny County (Chancellor) that denied High-

mark's motion for reconsideration, continued in effect the September 1, 1998, order that granted preliminary injunctive relief, and denied other relief as set forth in the order.

Charles J. Carlini, M.D. (Dr. Carlini) is a board-certified physician and surgeon who specializes in obstetrics and gynecology. Since 1980, Dr. Carlini has been a member of the medical staff of St. Clair Hospital, practiced in the South Hills area of Pittsburgh, and participated in various Highmark managed care plans. The Pennsylvania State Medical Board has never disciplined Dr. Carlini from the time he started practicing in 1972.

By letter dated August 4, 1997, Carey Vinson, M.D. (Dr. Vinson), Highmark's medical director, informed Dr. Carlini that Highmark's Credentials Committee (Credentials Committee) denied Dr. Carlini's recredentialing application to the Keystone network based on malpractice claims filed against him.[1] Dr. Carlini appealed the Credentials Committee's decision and attended a hearing before two Highmark physicians on January 5, 1998, at which time he submitted a letter from St. Clair Hospital's medical director, and discussed the malpractice cases in detail. The Hearing Panel (Medical Review Committee) recommended that the decision to terminate Dr. Carlini's participation in the Keystone network be reversed.

By letter dated February 11, 1998, Dr. Vinson advised Dr. Carlini that the Credentials Committee, upon reconsideration, upheld the earlier termination decision, and that the decision was to be communicated to the National Practitioners Data Bank (Data Bank).[2] On May 22, 1998, Dr. Carlini commenced an equity action against Highmark and alleged a breach of contract/denial of due process and sought

declaratory judgment. Dr. Carlini also alleged unfair competition. Shortly thereafter, Dr. Carlini petitioned for a preliminary injunction and requested recertification. The Chancellor initially denied Dr. Carlini relief and transferred the case to the "law" side on June 11, 1998.

Thereafter, Dr. Carlini's motion for partial reconsideration was granted on September 1, 1998. The Chancellor also entered a preliminary injunction against Highmark. The Chancellor ordered Dr. Carlini reinstated with Highmark and directed Highmark to retract the notice submitted to the Data Bank.

On July 6, 1999, the Chancellor overruled Highmark's preliminary objections and denied reconsideration, together with the motion to dissolve the injunction. Dr. Carlini's motion to strike was denied, and the transfer order was vacated. Lastly, the Chancellor directed that the September 1, 1998, order remained in effect.

The Chancellor concluded:

In this case, the granting of the preliminary injunction was necessary to preserve the status quo as it existed prior to Defendants' [Highmark's and Keystone's] decision to decertify Plaintiff [Dr. Carlini]. The reporting of this decision to the National Practitioner's Data Bank will undoubtedly have a devastating impact upon Plaintiff's [Dr. Carlini's] professional reputation. Additionally, as at least sixty (60) % of Plaintiff's [Dr. Carlini's] practice consisted of Defendants' [Highmark's and Keystone's] members, this Court believes that this injunction will prevent imminent and irreparable harm from occurring to Plaintiff [Dr. Carlini].

More importantly, this Court believes that Plaintiff [Dr. Carlini] has estab-

---

1. The Credentials Committee performed the function of a review committee as described in the bylaws. Dr. Vinson notified Dr. Carlini of his appeal option and provided directions for arranging a hearing. Additionally, the Hearing Panel acted as a medical review committee.

2. Pursuant to the Federal Health Care Quality Improvement Act (FHCQIA), health care entities must report decertifications to the Data Bank. 42 U.S.C. § 11133.

lished a clear right to relief under both state and federal law as well as on due process grounds as set forth by the Pennsylvania Supreme Court in *Rudolph v. Pennsylvania Blue Shield*, 553 Pa. 9, 717 A.2d 508 (1998) and *Lyness v. State Board of Medicine*, 529 Pa. 535, 605 A.2d 1204 (1992). Even though Defendants [Highmark and Keystone] afforded Plaintiff [Dr. Carlini] notice and a hearing, by disregarding the recommendations of the impartial peer review panel, Defendants [Highmark and Keystone], who acted as prosecutor, adjudicator and sentencer, violated Plaintiff's [Dr. Carlini's] statutory rights as well as his rights to due process of law.

Defendants [Highmark and Keystone] are Professional Health Services Plan Corporations and are thus governed by the Pennsylvania Professional Health Services Plan Corporation Act.... Accordingly, Defendants' [Highmark's and Keystone's] attempt to decertify Plaintiff [Dr. Carlini] is governed by the provisions of that Act.

Chancellor's Opinion, October 15, 1999, at 5–6. Highmark and Keystone appealed.[3]

■ On appeal,[4] Highmark and Keystone contend: 1) that the Chancellor erred when he concluded that Dr. Carlini established a clear right to relief under state and federal statutes; 2) that the Chancellor erroneously treated Highmark and Keystone as "state actors" and thereby rewrote Keystone's credentialing proce-

dures; and 3) that the Chancellor should not have granted injunctive relief because an adequate remedy at law was available.

■ A preliminary injunction is justified when the following criteria are satisfied:

1. A threat of immediate, irreparable injury that cannot be remedied through damages;

2. The injury resulting from the denial of the injunction is worse than the injury caused by granting the equitable relief; and

3. The injunction will restore the parties to their previous situations.

*Schaeffer v. Frey*, 403 Pa.Super. 560, 589 A.2d 752, 755 (1991). This Court will disturb the chancellor's decision only if "no grounds exist to support the decree or that the rule of law relied upon was palpably erroneous." *Lewistown Police*, 661 A.2d at 512 n. 15.

At the outset, Highmark and Keystone point out a discrepancy between the Chancellor's September 1, 1998, order and October 15, 1999, opinion. Pursuant to the September 1998 order, the Chancellor issued the injunction only against Highmark, whereas the October 1999 opinion referred to the Appellants, Highmark and Keystone, collectively. Even though the Chancellor did not enjoin Keystone specifically, the merits of Keystone's decertification decision[5] were the heart of the controversy.

3. Highmark and Keystone cite Section 762(a)(5) of the Judicial Code, 42 Pa.C.S. § 762(a)(5), which addresses not-for-profit corporations as a basis for this Court's jurisdiction. To the extent that one may argue that Highmark and Keystone do not fit within this classification, we note that this Court has jurisdiction over private club membership, hospital staff privileges, and church affairs. *See, e.g., Conference of A.U.F.C.M.P.C. v. Shell*, 426 Pa.Super. 374, 627 A.2d 188 (1993), *Sandoval v. Maliver*, 145 Pa.Cmwlth. 439, 603 A.2d 695 (1992), and *Pa. Dairy Herd Imp. Ass'n v. Wagner*, 132 Pa.Cmwlth. 556, 573 A.2d 668 (1990).

4. Our review of orders granting or denying a preliminary injunction "does not inquire into the merits of the controversy, but examines the record only to determine if there were any apparently reasonable grounds to justify the chancellor's action." *Lewistown Police v. Mifflin County*, 661 A.2d 508, 512 n. 15 (Pa. Cmwlth.1995).

5. The allegations of Dr. Carlini's complaint reflect that he sought injunctive relief against both Highmark and Keystone. Verified Complaint in Equity at 2; Reproduced Record (R.R.) at 29a. We note that the ambiguity between the order and opinion is not fatal because Keystone, as a subsidiary of Highmark, openly operates under the auspices of

### Dr. Carlini's Clear Right to Relief

Highmark and Keystone contend that the Chancellor should not have applied the Professional Health Services Plan Corporation Act, (PHSPCA), 40 Pa.C.S. §§ 6301–6335, because it does not govern Keystone's hearing procedures. However, the Pennsylvania Blue Shield Review Committee Guidelines, attached to Dr. Carlini's complaint, directly refer to the PHSPCA as controlling herein. *See* Verified Complaint in Equity at Exhibit C; R.R. at 62a. Section 6324 of the PHSPCA addresses the rights of health service doctors:

(a) Admission to plan.– Every health service doctor practicing within the area covered by any professional health service corporation shall have the right, on complying with such regulations as the corporation may make with the approval of the Department of Health, to register with such corporation for such general or special professional health services as he may be licensed to practice, within that area, but the corporation may, with the approval of the Department of Health, refuse to place the name of any health service doctor on its register. Any professional health service corporation may, with the approval of the Department of Health, remove from its register the name of any health service doctor after due notice and opportunity for hearing for cause satisfactory to the corporation.

. . . .

(c) *Disputes.—All matters, disputes, or controversies relating to the professional health services rendered by the health service doctors,* or any questions involving professional ethics, *shall be considered and determined only by health service doctors as selected in a manner prescribed in the bylaws of the profes-*

*sional health service corporation.* (emphasis added).

40 Pa.C.S. § 6324(a) and (c)

Pursuant to the applicable bylaws, Article X, Disputes and Controversies Involving Doctors, provides:

Section 1. Review Committees. All matters, disputes or controversies arising out of the relationship between the Corporation and professional providers who render health services to the Corporation's subscribers, including any questions involving professional ethics, shall be considered, acted upon, disposed of and determined by the appropriate one of the two Review Committees hereinafter referred to.

Section 2. Medical Review Committee. There shall be a Medical Review Committee consisting of at least five (5) members, each of whom shall be appointed by the Chairman of the Board of Directors of the Corporation and each of whom shall serve until his successor is appointed. A majority of the members of the Medical Review Committee shall be doctors who are either members of the Board of Directors of the Corporation or members of the Corporation.

Section 8. Proceedings Involving Status of a Doctor as a Participating Doctor. If a Review Committee determines that a hearing should be held with respect to any matter which has been stated in a Complaint, the Chairman shall promptly fix a time, date and place for such hearing. The Participating Doctor involved shall be given at least fifteen (15) days written notice by the Secretary of the Committee of the date, time and place of such hearing, and the doctor shall be furnished with a copy of the Complaint. ... At the hearing such witnesses may be heard and such evidence may be received as is deemed to be relevant and of reasonable probative value, provided, however, that formal

Highmark. In fact, Dr. Vinson's correspondence to Dr. Carlini listed both Highmark and Keystone on the letterhead. Because this in-

consistency involved only form, not substance, we find no resulting prejudice.

rules of evidence need not be adhered to. *The doctor affected by the Complaint shall be afforded an opportunity to be heard before the Committee, either in person or by counsel, and to produce evidence and witnesses at such hearing. ... After the hearing, the Review Committee, by majority vote of those members who are doctors, shall take whatever action it deems appropriate, based on the evidence and testimony produced at the hearing* and, if such action involves either suspension or termination of a doctor as a Participating Doctor, the matter shall be promptly referred to the Secretary of Health of the Commonwealth of Pennsylvania for approval or for such other action as he may deem appropriate. (emphasis added).

Verified Complaint in Equity at Exhibit C; R.R. at 59a–61a.

■ In the present controversy, the Medical Review Committee's recommendation to reinstate Dr. Carlini was dispositive in and of itself. Additionally, we disagree with Highmark and Keystone's contention that the Chancellor's reliance upon the FHCQIA, 42 U.S.C. §§ 11101 to 11152, was palpably erroneous. The Chancellor correctly noted that federal law delineates standards for professional review proceedings whereby physicians are entitled to due process. 42 U.S.C. § 11112. In footnote 3, the Chancellor's discussion regarding the FHCQIA serves as a supplement to its evaluation of the PHSPCA. Common Pleas Court Opinion at 5.

■ It is undisputed that Keystone is a licensed health maintenance organization (HMO) that offers commercial and Medicare products. Highmark and Keystone assert that Keystone falls within the purview of the Health Maintenance Organization Act, (HMO Act), Act of December 29, 1972, P.L. 1701, *as amended,* 40 P.S. §§ 1551–1568, and that no provision of the HMO Act grants a physician a right to a hearing before a contract is terminated. Nevertheless, we believe that there were reasonable grounds for the Chancellor's

application of the PHSPCA in these circumstances. In addition, we do not view the PHSPCA and the HMO Act as being mutually exclusive.

### Highmark and Keystone as "State Actors"

■ Highmark and Keystone contend that neither Highmark nor Keystone engaged in state action with respect to Dr. Carlini insofar as Keystone's credentialing process would have been required to afford Dr. Carlini due process. *Rudolph v. Pennsylvania Blue Shield,* 553 Pa. 9, 717 A.2d 508 (1998) is instructive as to the due process analysis.

In *Rudolph,* a participating Blue Shield physician rendered services to patients and was denied payment. Dr. Joseph P. Rudolph (Dr. Rudolph) had submitted a claim to a medical review committee which denied the claim. Subsequently, Dr. Rudolph filed a contract action in the Court of Common Pleas of Allegheny County (common pleas court), and the matter was referred to a panel of physician arbitrators. The panel found in Dr. Rudolph's favor, and the common pleas court confirmed the award. On Blue Shield's appeal, the Pennsylvania Superior Court vacated the common pleas court's judgment. *Joseph P. Rudolph, M.D. v. Pennsylvania Blue Shield,* 451 Pa.Super. 300, 679 A.2d 805 (1996).

Our Pennsylvania Supreme Court reversed the Superior Court's order and reinstated the common pleas court's judgment. *Rudolph v. Pennsylvania Blue Shield,* 553 Pa. 9, 717 A.2d 508 (1998). The Supreme Court determined that a medical review committee, formed pursuant to the PHSPCA, was a "creature of the state" and must adhere to due process standards. *Id.* at 14, 717 A.2d at 510.

In the present controversy, the review process utilized to evaluate Dr. Carlini's credentials is analogous to the medical review committee in *Rudolph,* certainly to the extent that both merit due process.

The guarantees of notice and a hearing must be conducted within a fair, impartial forum. *Rudolph,* 553 Pa. at 14, 717 A.2d at 510.

In light of the fact that the Credentials Committee in the present case upheld Dr. Carlini's decertification, there was a real possibility that the Medical Review Committee's recommendation was not given bona fide and genuine consideration. Certainly, based on our standard of review we cannot fault the Chancellor's conclusion that "[t]he impartial review process to which Plaintiff [Dr. Carlini] was statutorily entitled was, in the instant case, indeed illusory." Chancellor's Opinion at 8.

### Irreparable Harm that Cannot be Remedied by Damages

Finally, Highmark and Keystone contend that the Chancellor erred by granting injunctive relief despite Dr. Carlini's inability to prove the absence of an adequate remedy at law. Highmark and Keystone assert that Dr. Carlini's termination from the Keystone network did not harm his status as a Highmark provider because he continued to treat Highmark patients and SelectBlue patients as a non-network provider.

■ With respect to equitable relief, ' "the impending loss of a business opportunity" ' is considered to be irreparable harm. *West Penn Specialty MSO, Inc. v. Nolan,* 737 A.2d 295, 299 (Pa.Super.1999)(quoting *Sovereign Bank v. Harper,* 449 Pa.Super. 578, 674 A.2d 1085, 1093 (1996)). An irreparable injury causes ' "damage which can be estimated only by conjecture and not by an accurate pecuniary standard." ' *Id.* at 299, 737 A.2d 295 (quoting *Sovereign Bank,* 674 A.2d at 1091).

■ An affidavit by Dr. Carlini's office manager reflects 15.63% of Dr. Carlini's practice was provided under the Keystone network and 30.82% of Dr. Carlini's practice was provided under SelectBlue, a Highmark point-of-service plan. *See* Second Affidavit of Jacqueline M. Boyle, September 23, 1998 at 1; R.R. at 435a.[6] As these percentages reflect, a substantial portion of his practice is intimately involved with his participation with the Keystone network and Highmark. Undoubtedly, he would lose some patients and there is no way of knowing exactly how many. Absent speculation and conjecture Dr. Carlini's potential business loss cannot be reasonably measured.[7] The Chancellor properly concluded that the legal remedy available to Dr. Carlini was inadequate. In summary, we conclude that the Chancellor did not commit legal error by entering the preliminary injunction and reinstating Dr. Carlini until such time as a decision on the merits is rendered.

Accordingly, we affirm.

## *ORDER*

AND NOW, this 26th day of June, 2000, the July 6, 1999, order of the Court of Common Pleas of Allegheny County in the above-captioned matter is affirmed.

PELLEGRINI, Judge, concurring.

While I concur with the majority's decision to affirm the order of the Court of Common Pleas of Allegheny County (trial court) granting the preliminary injunction filed by Charles J. Carlini, M.D. (Dr. Carli-

---

6. We note that the Chancellor indicated that "as at least *sixty (60) % of Plaintiff's [Dr. Carlini] practice consisted of Defendants' [Highmark and Keystone] members,"* this Court believes that this injunction will prevent imminent and irreparable harm from occurring to Plaintiff [Dr. Carlini]. Common Pleas Court Opinion at 5 (emphasis added).

7. It is the position of Highmark and Keystone that if damages are eventually appropriate, they can be objectively calculated based simply upon the percentages of business of Dr. Carlini's practice that involve the Keystone program. The Chancellor rejected this argument and we agree.

ni) because it was the Medical Review Committee's ultimate decision to reinstate his participation in the Keystone network, I disagree with the majority that Highmark was a "state actor" requiring Dr. Carlini to be provided with due process during the recredentialing process.

In 1997, Dr. Carlini was informed by Highmark's medical director that its Credentials Committee had denied his recredentialing application to the Keystone network based on malpractice claims filed against him.[1] Dr. Carlini appealed that decision and pursuant to Highmark's (Blue Shield's) bylaws, a hearing was held before a Medical Review Committee consisting of peer physicians at which Dr. Carlini appeared and offered evidence in his defense. The Medical Review Committee recommended to the Credentials Committee that its decision to terminate Dr. Carlini's participation in the Keystone network be reversed, but despite that recommendation, the Credentials Committee upheld its earlier determination.

Dr. Carlini then filed a complaint in equity and a request for a preliminary injunction contending that when Highmark did not accept the Medical Review Committee's recommendation that he be reinstated as a participating physician, it violated his due process rights because Highmark was a "state actor" and its medical review procedures had to be in compliance with constitutional due process precepts applicable to state administrative agencies. Highmark responded by arguing that it was a separate entity from Keystone and Dr. Carlini never lost his right to participate in Highmark's network, only Keystone's network. Further, it stated that because Keystone was an HMO, the Health Maintenance Organization Act (HMO Act)[2] applied rather than the Pennsylvania Professional Health Services Plan Corporation Act (PHSPCA)[3] and did not require due process during the recredentialing process.

Not distinguishing Highmark and Keystone as separate entities because their letterhead bore both their names and had the same logos, the trial court found that a hearing had been held pursuant to Highmark's bylaws and the PHSPCA, and that Highmark was a creature of the state based on our Supreme Court's decision in *Rudolph v. Pennsylvania Blue Shield*, 553 Pa. 9, 717 A.2d 508 (1998)[4] whose proceedings were subject to due process review under the 14th Amendment to the United States Constitution. Citing *Lyness v. State Board of Medicine*, 529 Pa. 535, 605 A.2d 1204 (1992) (an administrative board, such as the State Board of Medicine, violates due process when it initiates disciplinary proceedings and then acts as the ultimate fact finder in determining whether a violation occurred), a decision decided under the Pennsylvania Constitution, it then held that the commingling of the

---

1. The parties intentionally did not supply the Court with the underlying facts relative to the malpractice claims.

2. Act of December 29, 1972, P.L. 1701, *as amended*, 40 P.S. §§ 1551–1568.

3. 40 Pa.C.S. §§ 6301–6335. Pursuant to 40 Pa.C.S. § 6324(a) and (c), all disputes relating to professional health services rendered by a physician covered by a health service corporation shall be considered and determined by health service doctors as selected in a manner prescribed in the corporation's bylaws. Highmark's bylaws require that a doctor affected by a complaint shall be afforded an opportunity to be heard before the Medical Review Committee and to produce evidence

and witnesses at such hearing. Article X, Sections 2, 8.

4. Our Supreme Court in *Rudolph* provided the following reasoning when finding that Blue Shield, a subsidiary of Highmark, was a state actor subject to the PHSPCA:

> This court has held that "the requirement of due process of law extends to administrative as well as judicial proceedings..." *Commonwealth v. Cronin*, 336 Pa. 469, 473, 9 A.2d 408, 410 (1939). Since the medical review committee is formed and functions pursuant to the terms of the regulatory act, it is a creature of the state, and like an administrative agency, is subject to due process review.
> *Id.* at 14, 717 A.2d at 510.

Credentials Committee's actions were inconsistent with the notion of due process embodied in the Pennsylvania Constitution and granted Dr. Carlini's request for a preliminary injunction and ordered his continued participation in the Keystone network.

The majority affirms the trial court's decision for two reasons. First, under Highmark's bylaws, it is the Medical Review Committee that makes the final determination as to whether a physician will be terminated from a network. Second, based on *Rudolph*, Highmark is a "state actor" and all the due process standards that apply to governmental bodies are applicable to Highmark's review process. While I agree with the majority that for purposes of a preliminary injunction the Credentials Committee's decision could not apply, I disagree that Highmark is a state actor.

At the core of the majority's decision is that Highmark's bylaws control. However, Dr. Carlini's relationship with Keystone was terminated, not with Highmark. Highmark and Keystone are two separate entities. Highmark is a corporation that is governed by the PHSPCA and Keystone is an HMO governed by the HMO Act. Pursuant to Section 6324 of the PHSPCA, all disputes are to "be considered and determined only by health service doctors as selected in a manner prescribed in the bylaws of the professional health service corporation." Under Highmark's bylaws, a hearing is required to be provided by the Medical Review Committee which determines what action is necessary to take. Its decision is dispositive. If the action involves either suspension or termination of a doctor as participating, the matter is then referred directly to the Secretary of Health for approval. Under the HMO Act, there is no requirement for a hearing prior to termination or suspension.

While this distinction exists, Highmark sent a letter to Dr. Carlini indicating that it had streamlined its credentialing process for all of its managed care networks, including Keystone, saying that Highmark's bylaws control. It is from that letter that the trial court determined that Highmark's credentialing process governed rather than Dr. Carlini's contract with Keystone. Because I agree that this letter could serve as a reasonable basis upon which the trial court could find that Highmark's bylaws control, I agree with the majority that the grant of the preliminary injunction was proper.

However, where I part company with the majority is its finding that Highmark is a state actor, thereby making all the procedural safeguards required under the Pennsylvania and United States Constitutions applicable. Initially, I would point out that *Rudolph*, the case relied on by the majority, has no precedential value because only three of the six Justices agreed that the medical review committee was a state actor, with the other three justices specifically rejecting that view. *McGowan v. University of Scranton*, 759 F.2d 287 (3 rd Cir.1985) (decision of less than a majority of the Commonwealth's Supreme Court Justices is not binding or controlling precedent). In his dissenting opinion in *Rudolph*, Justice Zappala stated that:

> The parties to this action are Blue Shield, a private, non-profit, professional health services corporation, and former participating Blue Shield physicians and professional corporations. Pursuant to Section 6324(c) of the Professional Health Services Plan Corporation Act, 40 Pa.C.S. § 6324(c), disputes relating to the professional health services rendered by health service doctors "shall be considered and determined only by the health service doctors as selected in a manner prescribed in the bylaws of the professional health service corporation." [553 Pa. at 21, 717 A.2d 508] (Emphasis added). Article X of Blue Shield's Bylaws provides that all disputes "shall be considered, acted upon, disposed of and determined by the [Medical Review Committee]." The parties to this matter entered into a private contract whereby Appellants agreed that they would "perform services ... and accept

compensation therefore, as provided for in the ... Regulatory Act ... and [Appellee's] Bylaws."

The Legislature, in enacting the Regulatory Act, did not specify in what manner professional health service corporations are to resolve disputes relating to the professional health services rendered by health service physicians. To the contrary, the Legislature specifically left it to the discretion of professional health service corporations, through their bylaws, to establish how disputes should be resolved. Section 6324(c) in no way directs, limits or guides professional health service corporations concerning the manner in which they are to structure their bylaws regarding dispute resolution.

Given that professional health service corporations are free to set forth, in their bylaws, whatever dispute resolution scheme they deem appropriate, without direction from the Legislature, i.e., the state, there is not a sufficiently close nexus between the state and the challenged action for due process to be implicated. See, e.g., *Staino v. Pennsylvania State Horse Racing Commission*, 98 Pa.Cmwlth. 461, 512 A.2d 75, 77 (1986), wherein the court noted:

> Because a private corporation is licensed and pervasively regulated by the state does not make its actions "state actions" meaning that those actions must comport with the requirements of the Fourteenth amendment to the constitution...
>
> Moreover, the fact that a private party follows a procedure outlined in a state statute does not convert the private action into state action.

717 A.2d at 513–514.

Recently, the United States Supreme Court in *American Manufacturers Mutual Insurance Company v. Sullivan*, 526 U.S. 40, 119 S.Ct. 977, 143 L.Ed.2d 130 (1999) echoed that reasoning when it addressed whether a private health insurer was a state actor when it withheld payment for medical expenses for an employee's work-related injury under the Pennsylvania Workers' Compensation Act subject to the constraints of the Fourteenth Amendment. The Supreme Court determined that the decision of a private insurer to request the review was not state action, explaining that private insurers could not be held to constitutional standards unless there was a sufficiently close nexus between the State and the challenged action so that the latter could be fairly treated as that of the State itself. "Whether such a 'close nexus' exists, our cases state, depends on whether the State has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State ... Action taken by private entities with the mere approval or acquiescence of the State is not state action." 119 S.Ct. at 986. Additionally, "[t]he mere fact that a private business is subject to state regulation does not by itself convert its action into that of the State for purposes of the Fourteenth Amendment." *Id.* Based on this reasoning, Highmark is simply a private business and not a state actor because it does not receive significant "encouragement from the State."

Accordingly, I concur in the result only.