# The Mammoth Vein Consolidated Coal Company's Appeal.

1. In a dispute as to their rights between parties claiming under different leases of the same coal-veins, no injunction can be granted until the questions of their rights are settled.

2. A preliminary injunction is a restrictive or prohibitory process to compel the party to maintain his *status* merely until the matters in dispute shall be determined; the foundation being to prevent irreparable injury.

3. A preliminary injunction is to be resorted to only from a pressing necessity to avoid consequences which cannot be repaired under any standard of compensation, and is a *preventive* remedy only.

January 29th 1867. Before WOODWARD, C. J., THOMPSON, STRONG, READ and AGNEW, JJ.

Appeal from the decree of the Court of Common Pleas of *Schuylkill county*, in Equity, in a proceeding by bill of September 1866, in which the St. Clair Coal Company were complainants, and The Mammoth Vein Consolidated Coal Company and William H. Sheaffer, superintendent, were defendants.

The appeal was by the defendants.

On the 1st of February 1862, Henry C. Carey and others executed a lease to the firm of William Milnes, Jr., & Co., in which, besides the right to mine for coal on a portion of "the Saint Clair tract," granted by agreements in 1856 and 1858, they further leased to Milnes & Co. the right to mine and take away the coal in the "Seven Foot Vein and the Big Vein, on the Saint Clair tract, to be bounded southward by a gangway commencing at" a point described "on a gangway driven in the Big Vein, westwardly from the new slope where the said gangway first enters the Saint Clair tract from the Lee lands, and driven at as near water level as is practicable for the sufficient drainage of the mines; first, southwardly through the upper benches of the Big Vein, and the slate overlaying the same, to and into the Seven Foot Vein, at or about"—another point described—"and thence on the Seven Foot Vein, at such courses and distances as the

undulations on the strike of the vein may require the gangway to be driven. The said gangway, when driven to the western line of the Saint Clair tract, to be continued on the Ellmaker tract to and at the same level as, the Seven Foot Vein gangway, now at work on the Ellmaker tract at"—a third point described—" about 220 feet west of the line of the Saint Clair tract. And the said gangway in the Seven Foot Vein, when driven through the Saint Clair tract as aforesaid, shall be the boundary line, north of which this agreement grants to the said William Milnes, Jr., & Co. the right to dig, mine and take away all the coal on the said Saint Clair tract, in the two veins before mentioned."

On the 17th of March 1862, the same Henry C. Carey and others leased to Ell Hart for twenty years, with right to assign with the assent of the lessors: "All those parts of two veins of coal, known as the Seven Foot Vein and the Big Whiteash Vein, on the Saint Clair tract of land, situate, &c., * * and from which two veins of coal Kirk & Baum were recently mining coal by the Mammoth shaft and the Mammoth slope, within the following limits, to wit, at the north-west part of the said tract of land, to the distance of sixty feet from that part of the coal in the said two veins of coal leased by the said party of the first part to William Milnes, Jr., and John Milnes, by agreement dated the 1st day of February 1862."

On the 29th of March 1864, Hart, with the consent of his lessors, assigned to the Saint Clair Coal Company, complainants, " the said lease for the unexpired term aforesaid, excepting and reserving therefrom and thereout the right to William Milnes, Jr., & Co., who are also lessees of a part of the Saint Clair tract, or their successors or assigns, to sink their old or eastern slope one hundred yards below the present foot of the old eastern slope aforesaid, and at the said depth of one hundred yards to run westwardly on a line parallel with the line located by R. Cleaver and G. K. Smith, July 1858, to the Ellmaker tract, said depth being sixty-seven yards lower than agreed in the lease made to William Milnes, Jr., & Co., by the owners of the Saint Clair tract on the 1st day of February 1862, and in consideration thereof the said William Milnes, Jr., & Co., their successors or assigns, are to pay 5 cents per ton on all large coal, and 2½ cents on all chestnut and pea coal taken from the said sixty-seven yards in depth, unto the Saint Clair Coal Company, in addition to such sum or sums to be received by the owners of said tract as may be agreed between them and the said William Milnes, Jr., & Co."

On the 16th of May 1864, the same H. C. Carey and others executed another lease by which, in addition to rights theretofore granted to Milnes & Co., they granted " the right to sink their old or eastern slope sixty-seven yards below a point which they agreed to sink their old or eastern slope, according to the agree

ment of February 1st 1862; and they are to drive their gang-way westwardly on that level, on the course of the vein, and are to strike the eastern line of the Saint Clair tract sixty-seven yards below their present Big Whiteash Vein gangway, now on said tract; they to dig, mine and take away all the coal north of that line on that level; said gangway to be driven westwardly through said Saint Clair tract, on a line parallel with the line located by Kimber Cleaver and George K. Smith, July 1858, to the Ellmaker tract; but they shall not and will not take away any coal south of the line above described."

Milnes & Co. transferred their leases to the defendants, who entered and commenced mining on the tract.

The bill alleges that the defendants are encroaching on the coal-veins demised to the complainants, and taking away large quantities of coal from them; that they have already taken away about 40,000 tons; that " in consequence of these encroachments and trespasses, the shaft workings of the plaintiffs cannot, in future, be operated without leaving all the coal now standing between the said shaft workings on the Seven Foot Vein and the gangway of the defendants, as a barrier which may prove insuffi-cient against the water in defendants' mines, the distance being only two hundred feet from said workings to said gangway. Besides the danger from water and the probability of a crush, the direct, immediate and certain effect of these trespasses is to reduce the future productiveness of plaintiffs' colliery one-half, or at least fifty cars per day.

" That the defendants are driving their said gangway to the Ellmaker tract, adjoining the Saint Clair tract, with all possible speed and despatch. The said gangway has been driven in a south-westerly direction, instead of a westerly direction, from the point of commencement, as required by their lease on a dip of five degrees, a distance of one hundred yards, thereby encroach-ing upon and destroying a large and valuable portion of the demised premises of the plaintiffs, and greatly endangering the shaft workings aforesaid: that the plaintiffs, in order to keep up the productiveness of their colliery to an extent commensurate with their outlay of capital and covenants, will be obliged to sink a new slope below their present shaft. The defendants have also encroached on the Big White Ash Vein from the bottom of their eastern slope, by driving their gangway south over the line described in the transfer of lease aforesaid to the plaintiffs: * * that the damages, present and prospective, will amount to a large sum of money."

The bill prayed:—

1. That the defendants may be restrained, by preliminary injunction till hearing, and perpetually thereafter, from working the Seven Foot and Mammoth Veins of coal, or portions thereof demised to the plaintiffs.

[Mammoth Vein Coal Co.'s Appeal.]

2. That defendants may be required to account for all coal taken away, and for damages done to the plaintiffs' colliery.

No answer was filed; the case was heard on affidavits.

The defendants' working was upon upper levels in the same veins as complainants'.

The witnesses for complainants stated that defendants had taken out about 40,000 tons of coal from the portions of the veins leased to complainants; that working of defendants prevented complainants working on one of their gangways, for if they did it would not leave pillar enough to keep the water up; that the distance between the works was 100 or 150 feet; if the workings should be stopped and water accumulate there would be danger of a crush; that there was no such danger at present; that complainants could not get coal above defendants' gangway if the defendants continued their workings; if the gangway should be driven into the Ellmaker tract it would draw the water from that and other tracts, and there would be a danger of filling complainants' mines with water; the witnesses also testified as to the workings of respondents being an encroachment in particulars detailed, and generally.

The clerk of defendants testified to paying complainants for coal taken, and of no complaint of improper working having been made. Engineers and other witnesses of defendants testified that it was impossible, on account of the formation of the veins, to drive the gangways otherwise than was done; that from the fall of 1865 to June 3d 1866, the gangways had been continuously driven, and during that time had been inspected regularly by the engineer and agent of the lessors, and that he did not give any intimation to the superintendent that he was driving in the wrong place, but had told him as to one that the defendants were the only parties that could take coal out at that point; that stopping the gangways and the workings on them in dispute would reduce the capacity of the colliery 170 tons a day, besides preventing them from getting coal from other coal tracts. It was also testified that the tunnel was driven at as near a water level as practicable for the proper drainage of the mines; that where the gangway is now driven is the only point at which it is possible to work the "Seven Foot Vein."

On the hearing, the court appointed Henry Pleasants and Stephen Harris, two mining engineers, examiners, "to examine the workings of the respondents * * for the purpose of ascertaining the course of the Mammoth Vein," &c. * * "according to the lease of May 1864, and to report their conclusions to the court, in writing, together with any remarks they may be pleased to make upon the subject."

The examiners made a report, with an accompanying map, which it is not necessary to detail under the views of the Supreme Court.

[Mammoth Vein Coal Co.'s Appeal.]

On the 11th of October 1866, the court (Ryon, P. J.) decreed:—

"That the Mammoth Vein Consolidated Coal Company, respondents, be enjoined and restrained (until further ordered) from further driving westward the gangway on the Seven Foot Vein of coal towards the Ellmaker tract, which said gangway is south of and below the point C., mentioned in the lease dated 1st February 1862, to William Milnes, Jr., and John Milnes, as lessees, and transferred to respondents, or from mining or taking away coal mined therein, west of the point designated D. on the map, to be filed herewith; and also from driving the gangway farther east on said vein from the point designated E. on said map, or from mining or taking away coal mined therein; and also from further driving the gangway on the Mammoth Vein from the foot of the new slope (driven 200 feet, under lease of 16th May 1864) beyond the point designated I. on said map (denoting the face of the gangway), or from mining coal therein south of the point represented on the said map by dotted lines (which said lines were made upon said map by Henry Pleasants and Stephen Harris to denote the course of the vein from the foot of the slope); and said respondents shall not take away any coal south of the line designated by said dotted lines; and shall drive their gangway according to the course indicated by said dotted lines and the report of said Pleasants and Harris, on north of said dotted lines, if practicable, so as to reach the point J. (as shown on said map), by the most direct and feasible course, on the course of the vein, from the point in the present gangway, 125 feet from the foot of the slope, according to the terms of the aforesaid lease."

The error assigned was granting a preliminary injunction.

*F. B. Gowen* and *J. Bannan*, for appellants.—The positions taken by appellants were:—

1. That the gangway driven towards the Ellmaker tract is not in violation of the terms of the lease of February 1st 1862.

2. That, admitting that the gangway is further south than the course prescribed by the lease, all damage which could possibly result to the plaintiffs in consequence has been already sustained, and there is no such future or continuing injury to be apprehended as would justify a court in awarding a preliminary injunction.

3. That the plaintiffs have no right to a decree enjoining the defendants from mining upon lands to which the plaintiffs have neither title nor claim of title.

4. That the plaintiffs have an adequate remedy at law for all injuries sustained by them, and that their bill in equity cannot be maintained against the defendants, who are in possession under claim of title; and cited Lowndes *v.* Bettle, 4 Am. Law Reg. 169.

[Mammoth Vein Coal Co.'s Appeal.]

*B. W. Cumming*, for appellees.—The only lawful possession the appellants had. was of those portions within their proper boundaries. What constitutes possession is a question of great importance: Mitchell *v.* Dors, 6 Ves. 147. Where a trespasser works a mine to the injury of the owner an injunction will be granted: 2 Story's Eq. § 929; Brown *v.* Weir, 5 S. & R. 402; Denny *v.* Brunson, 5 Casey 382; Scheetz's Appeal, 11 Id. 95. In this case the right can be ascertained.

The opinion of the court was delivered, February 14th 1867, by Thompson, J.—We have examined the affidavits and other proofs exhibited pro and con. by the parties on the hearing of the motion for a preliminary injunction in this case, and the order or decree made in granting it. We cannot but regard the decree as much more in the nature of a final, than a preliminary decree, for it not only enjoins, but directs what the defendants shall do. Indeed, the contest before the court seems to have left out of sight the true nature and object of the writ of injunction applied for, and became involved in questions about the rights of the parties under the terms of their respective leases. If these were in dispute, it is obvious no injunction could be granted until questions respecting those rights were settled at law or in equity. It ought not to be forgotten that a preliminary injunction is a restrictive or prohibitory process, designed to compel the party against whom it is granted to maintain his status merely until the matters in dispute shall by due process of the courts be determined; the sole foundation for such an order being, in addition to cases of the invasion of unquestioned rights, the prevention of irreparable mischief or injury. As a preliminary injunction is in its operation somewhat like judgment and execution before trial, it is only to be resorted to from a pressing necessity to avoid injurious consequences which cannot be repaired under any standard of compensation. It is therefore a preventive remedy only. The number of tons of coal which it was alleged by the plaintiff the defendants had mined and taken and claimed, was a past transaction, and could not be touched by a preliminary injunction. So also, if the direction of the defendants' gangway did cut off coal from the plaintiffs, which, but for it, they might have taken out, this, like the other cause of complaint, was also a past transaction, and not to be redressed by preventive process.

Nor do we think the peril from water, if the defendants should proceed into the Ellmaker tract with their gangway, was shown to be so imminent as to require the stoppage of the defendants in their progress towards that point. At most it was speculative; contingent on the defendants ceasing to operate under their lease. But it was not shown that they meditated or threatened this.

[Mammoth Vein Coal Co.'s Appeal.]

Had it been made manifest that the consequence of the defendants' operations would have the effect of letting the water in large quantities into the plaintiffs' mine, it would assuredly have been proper to have enjoined them from proceeding, even although they were operating exactly within the terms of their lease. But that did not appear. Protection against the contingency which the plaintiffs seem to have feared, namely, the drowning out of their works by the cessation of the defendants to mine, can no doubt be guarded against on final hearing, if it exist, when all the facts in exact form will be before the court; but threatened irreparable mischief from this cause was not shown to exist or reasonably to be apprehended, so as to justify the granting of the preliminary injunction. Indeed, the defendants gave a great preponderance of proof to show that the plaintiffs all the while knew of their operations, the direction and extent of their work, and made no objection. Even if the matter of fact had been so balanced in the proof as to have left it in doubt, this would have been sufficient to have prevented the granting of an injunction, for the plaintiffs should have made known their objections and put the defendants on their guard against expending their money, on what they meant should not be realized by them. It may be that on final hearing grounds for intervening as prayed, may be made manifest; but about this we express no opinion. We only say that the case when heard did not present such an aspect as required the highest exercise of the chancellor's power to restrain the defendants.

The statute under which this appeal was taken is an experiment in this state, and will assuredly be fraught with bad and annoying consequences, in the increase of expenses in proceedings in equity, incident to double hearings and arguments in the courts below, and in this court, in all preliminary decrees for injunctions, unless the courts are careful to grant them only where it clearly appears that the purposes of such writs are plainly proper, viz., to prevent irreparable mischief. That was not the case in our opinion in this instance, and we must therefore reverse the decree.

And now to wit, February 14th 1867, the order and decree of the 11th of October 1866, entered in the court below at the instance of the plaintiffs against the defendants in this case, is reversed, annulled and set aside, together with the writ issued in pursuance thereof, at the cost of the appellees.