**Reading Private Trash Haulers v. City of Reading**

24

C.P. of Berks County, no. 98-13655.

*Garland L. Thompson,* for plaintiffs.
*David E. Turner* and *Keith Mooney,* for defendants.

STALLONE, *J.,* May 20, 1999—Earlier this decade, the residents of the City of Reading considered changing their form of government. A written "home rule charter" was drafted pursuant to the Pennsylvania Home Rule Charter Law.[1] It was adopted by a majority of the voters of the City of Reading and became effective in January 1996, at which time the Honorable Paul J. Angstadt, mayor of the City of Reading, and the members of the newly-elected city council took office.

In May 1996, Mayor Angstadt and city council undertook what became known as the "clean city initia-

_____

1. Title 53, 53 Pa.C.S. §2901 et seq. (Supp. 1999).

tive," pursuant to which they appointed seven citizens to be members of a non-paid, volunteer advisory group known as the "clean city coordinating committee." The formation of that committee led to the creation of a solid waste collection task force whose purpose it was to examine trash collection practices in the City of Reading and to develop recommendations for legislative action by city council, because of what was perceived to be a citywide problem with illegal trash dumping and the failure of some city property owners to have their trash picked up.

Following an intensive six-month study, the solid waste collection task force issued a written report dated June 2, 1997, in which it recommended that the city council adopt a municipal trash collection system which would require the owners of residential properties to participate in a uniform system of trash collection. Under this proposal, the City of Reading would provide municipal trash collection for city residents which would be paid for by a flat yearly fee to be charged to city residents.[2]

On December 8, 1997, following a series of public meetings and hearings on the advisability of a municipal trash collection system, city council recognized that it had a highly volatile political matter before it and, instead of voting on the proposed program, adopted ordinance no. 29-97, which was then approved by Mayor

2. This municipal trash collection system was designed to replace existing trash collection practices whereby property owners would contract with a private trash hauler, which the members of the solid waste collection task force concluded was inefficient, disorganized and resulted in the increase of illegal dumping of trash on public and private property by irresponsible property owners who do not pay for trash disposal.

Angstadt on December 11, 1997, and which provides as follows:

"Bill No. 29-97

"An Ordinance

"Placing the question of whether the City of Reading shall provide a comprehensive system of municipal trash collection for residences within the city limits on the ballot for the primary election of 1998.

"The City of Reading hereby ordains as follows:

"*Section 1.* The following question shall be placed on the ballot for *binding referendum*[3] for the registered electors within the City of Reading for the primary election in May of 1998.

"Shall the City of Reading implement ordinance 30-97 establishing a comprehensive residential trash and recycling collection program at an annual fee, before penalty or rebate not to exceed $115 per household through June 30, 2001?[4]

"*Section 2.* The city clerk is hereby authorized and directed to file a certified copy of this ordinance with the Berks County Board of Elections, together with a copy of the referendum question to be submitted to the electors as set forth in this ordinance.

"*Section 3.* The results of said referendum shall be *binding* upon the administration and upon the city council of the City of Reading.

"*Section 4.* This ordinance shall become effective immediately upon adoption."

---

3. Italicized type will be added throughout this adjudication for emphasis only.

4. Through June 30, 2001 would have been more than three years from the May 19, 1998 date of the allegedly binding decision.

Proposed ordinance no. 30-97 was to provide a *"comprehensive"* plan for the disposal of trash from all single-family and multi-family dwellings up to and including four units regardless of whether they were owner-occupied. On May 19, 1998, the residents of the City of Reading voted to reject proposed ordinance no. 30-97 by a vote of 7,067 to 4,040.

However, six months later, on November 16, 1998, the City of Reading Public Works Department issued a 50-page written *"Request for Bids, Collection & Disposal of Municipal Solid Waste & Recyclables from Public Buildings, Litter Baskets, Interim Assistance and Rental Properties,"* with a view toward receiving bids for mandatory municipal trash collection service for rental properties comprised of single-family and multi-family dwellings containing up to and including four units which were not occupied by the owners.[5]

On December 21, 1998, the plaintiffs filed the instant actions, no. 98-13655 and no. 98-13656, asking this court to prohibitorily enjoin the City of Reading, along with the individual defendants, from acting on any bids which the City of Reading had received pursuant to the aforesaid written request.[6] The individual plaintiffs in action no. 98-13655 are the owners and operators of private trash hauling businesses who have collected trash from city residents for a number of years and are members of plaintiff Reading Private Trash Haulers Association.

---

5. Although other units were included, a discussion of those classifications is not material to the underlying issues raised in these two actions.

6. In their complaint, the plaintiffs sought not only injunctive relief but also the issuance of a writ of mandamus as an alternative form of relief which they have since withdrawn.

Wally Scott, the plaintiff in action no. 98-13656, is a resident and qualified voter of the City of Reading. In their complaints, the plaintiffs allege that the city's written request for bids constituted an "evil attempt" to establish, albeit in stages, the same *comprehensive* municipal trash collection system which the residents of the city had rejected on May 19, 1998, and that this decision was "binding," as stated in ordinance no. 29-97, upon Mayor Angstadt and city council for two years which they allege is the prohibitory period for reconsideration under the home rule charter of the City of Reading.

Following the defendants' filing of an answer to the plaintiffs' complaint on January 12, 1999, in which they contested the plaintiffs' entitlement to injunctive relief, the plaintiffs filed a motion with this court on February 18, 1999, seeking the issuance of a "preliminary" injunction, asking this court to stop any further action by the defendants in either implementing their written request for bids or in adopting pending ordinance no. 5-99 which provides in pertinent part as follows:

"Bill No. 5-99

"An Ordinance

"An ordinance of the City of Reading defining and regulating the collection, transportation, storage and disposal of solid waste and recycling; providing for the permits to authorize any commercial hauler that fulfills the obligations of the license process to collect solid waste and recycling within the City of Reading

"Section 1115.4 Solid Waste Collection Requirements

"(A) *Contracts for collection; authority*

"The city is authorized to award a contract for the alley collection, removal, transportation and disposal of *unlimited refuse, large items, white goods and bulky*

*waste which are generated from* single-family residential dwellings and multi-family residential dwellings as described below. Said contract may be for a term not exceeding five years. The contract shall contain a provision that the contract is to be performed and carried out by the contractor in compliance with all applicable city ordinances.

"(1) *Required collection*

"(a) Non-owner occupied single-family and multi-family dwellings up to and including four units.

"Municipal waste generated by the occupants of non-owner occupied single-family and multi-family dwellings up to four units, inclusive, shall be included for collection by the authorized city contractor in accordance with all applicable sections of this ordinance."[7]

Inasmuch as the mayor agreed to refrain from awarding any contracts in the event that pending ordinance no. 5-99 was adopted (which it was on February 22, 1999), this court denied the plaintiffs' request for a "preliminary" injunction and instead set aside dates certain for a non-jury trial on the entire matter. Following the close of the pleadings and the holding of two pretrial conferences with counsel for the parties, this court held that non-jury trial at which the parties submitted both testimonial and documentary evidence. We now file this adjudication and decree nisi in disposition of their respective claims and defenses.

Under Pennsylvania law, the plaintiffs must establish that their right to preliminary injunctive relief is "clear." *Sovereign Bank v. Harper,* 449 Pa. Super. 578, 674 A.2d

---

7. See footnote 5.

1085 (1996); *Moore v. Mobil Oil Company,* 331 Pa. Super. 241, 480 A.2d 1012 (1984); *Lewis v. City of Harrisburg,* 158 Pa. Commw. 318, 631 A.2d 807 (1993). Therefore, in order for this court to conclude that the plaintiffs have met that burden, it would have to conclude that they have proven each of the following by clear and convincing evidence:

(1) That city council had the legislative authority pursuant to the provisions of the home rule charter, the Pennsylvania Home Rule Charter Law and/or the Pennsylvania Constitution to adopt ordinance no. 29-97, which placed the question on the ballot;

(2) That proposed ordinance no. 30-97, which was the subject of the May 19, 1998 question, was properly placed on the May 19, 1998 ballot notwithstanding the fact that it involved a matter of public health and safety;

(3) That if city council had the legislative authority from the home rule charter, the Pennsylvania Home Rule Charter Law and/or the Pennsylvania Constitution to place the question on the May 19, 1998, ballot and that it was properly placed on the ballot notwithstanding the fact that it involved a matter of public health and safety, the results of the city residents' vote on this ballot question are binding upon Mayor Angstadt and city council for a period of two years; and

(4) That because ordinance no. 5-99 is a "part and parcel" of the "comprehensive residential trash and recycling collection program" envisioned by ordinance no. 30-97, which was rejected by the city residents on May 19, 1998, its passage was barred for a period of two years.

Beginning with article XI of the home rule charter, we find that article XI sets forth the manner in which the *citizens of the City of Reading* have the right to partici-

pate in the governing of the City of Reading and which provides as follows:

"Article XI

"Citizen's Rights And Participation

"*Section 1101. General provisions.*

"The council shall protect and promote the right of the citizens of the City of Reading to participate in a positive and constructive manner in the government of the city. *Any citizens of the city may participate in the government of the city by:*

"(a) Seeking elective office of the city as prescribed by this charter and voting for candidates for elective office;

"(b) Serving on boards, commissions, authorities or other agencies of the city government when requested by the appropriate officials;

"(c) Attending and being heard at public meetings of the council and other boards, commissions, authorities and agencies of the city government;

"(d) Addressing suggestions to the council and others to provide guidance for their actions;

"*(e) Exercising the right of initiative, referendum, and recall of elected officials as provided in this charter or as otherwise may be provided by law.*"

It is clear, therefore, that article XI provides the means by which qualified voters may "participate in the government of the city" . . . and that that "right of the citizens of the City of Reading" includes "[e]xercising the right of initiative, referendum . . . *as provided in this chapter or as otherwise may be provided by law.*"[8]

---

8. Despite having been directed by this court time and time again to do so, the plaintiffs have failed to cite any statutory provision of the

Sections 1102 through 1104 of article XI then describe in detail the manner in which the citizens shall exercise that right of initiative and referendum:

"*Section 1102. Initiative and referendum.*

"(a) *Initiative.* The qualified voters of the city shall have the *power to propose ordinances to the council.* If the council fails to adopt such an ordinance, the initiative process may be commenced giving the qualified voters of the city the opportunity to adopt or reject said ordinance at a city election.

"(b) *Referendum.* The qualified voters of the city shall have *the power to require reconsideration by the council of any adopted ordinance.* If the council fails to repeal an ordinance so reconsidered, the referendum process may be commenced giving the qualified voters of the city the opportunity to approve or reject said ordinance at a city election.

"*Section 1103. Initiative and referendum; commencement of proceedings; petitioners' committee; affidavit.*

"*Any five qualified voters of the city may commence initiative or referendum proceedings* by filing with the city clerk an affidavit stating they will constitute the petitioners' committee and be responsible for circulating the petition and filing it in proper form, stating their names and addresses and specifying the address to which all notices to the committee are to be sent, and setting out in full the proposed initiative ordinance of citing the ordinance sought to be reconsidered. In case of referendum, such an affidavit must be filed within 10 days of the adoption of the ordinance. Within five days after the

---

Pennsylvania Home Rule Charter Law or to any other law or article and section of the Pennsylvania Constitution which would have given city council that authority.

affidavit of the petitioners' committee is filed and validated, the city clerk shall issue the appropriate petition blanks to the petitioners.

"*Section 1104. Initiative and referendum; petitions.*

"(a) *Number of signatures.* Initiative and referendum petitions must be signed by 2,000 qualified voters of the city.

"(b) *Form and content.* All papers of a petition shall be uniform in size and style and shall be assembled as one instrument for filing. Each signature shall be executed in ink or indelible pencil and shall include the address of the person signing and the date signed. Petitions shall contain or have attached thereto throughout their circulation the full text of the ordinance proposed or sought to be reconsidered.

"(c) *Affidavit of circulator.* Each paper of a petition shall have attached to it when filing a notarized affidavit executed by the circulator thereof stating that he or she personally circulated the paper, the number of signatures thereon, that all the signatures were affixed in the circulator's presence, and believes them to be valid and that each signer had an opportunity before signing to read the full text of the ordinance proposed or sought to be reconsidered.

"(d) *Time for filing referendum petitions.* Referendum petitions must be filed within 35 days after the filing of the affidavit of the petitioners' committee.

"(e) *Time for circulation and filing initiative petitions.* Initiative petitions must be circulated and signed within a period of 65 days from the date of the filing of the affidavit of petitioners' committee with the city clerk."

These sections 1102 through 1104 make it clear that only qualified voters of the City of Reading shall have the power to "commence initiative or referendum pro-

ceedings" under article XI of the home rule charter. And although city council now publicly acknowledges that it did not, nor could it ever have followed, those procedures that admission does not permit this court to conclude that city council had the necessary legislative authority to adopt ordinance no. 29-97 which, if it had, of course, would have given legal validity to the results flowing from the May 19, 1998 vote.[9]

In response to city council's acknowledgment, the plaintiffs contended at trial that sections 102 and 105(a) of article I of the home rule charter gave city council the legislative authority to place the question on the May 19, 1998 ballot, irrespective of the specific "initiative and referendum" procedures set forth in sections 1102 through 1104 of article XI. Sections 102 and 105(a) read as follows:

"Article I

"Power Of The City

"*Section 102. Grant of power*

"The city shall have the power to exercise any power or to perform any function not denied by the Constitu-

---

9. Only after this court directed counsel for the parties, in preparation for the second pretrial conference, to address this issue in writing did the defendants acknowledge that city council's authority to commence this "referendum" was spurred on not by the home rule charter but by its belief that a petition drive would be organized by at least five city voters to have this issue placed on the May 19, 1998 ballot for an "initiative and referendum" vote. Moreover, this court was advised that no effort was made by city council or the mayor to consult with the city solicitor's office to determine whether the home rule charter permitted city council to pass such an ordinance (29-97) without first having "five qualified voters of the city" commence the "initiative or referendum proceedings." Nor did the city council seek to determine the meaning of the term "referendum," which, on legislative questions, is limited by the charter to situations where the voters are asking *city council to reconsider a previously adopted ordinance.*

tion of the United States, by the Constitution of Pennsylvania, by act of the General Assembly of Pennsylvania, or by this charter.

*"Section 105. Construction*

*"(a) Powers.* The powers of the city under this charter shall be construed liberally in favor of the city, and the specific mention of particular powers in the charter shall not be construed as limiting in any way the general power of this article."

The plaintiffs, however, argue that section 105(a) would allow this court to reasonably infer that city council had the legislative authority to commence this process on its own initiative because the home rule charter did not specifically prohibit city council from doing so. We disagree inasmuch as this court must look to article II, which sets forth the powers of the *city council,* to determine what powers it has. Section 208 of article II sets forth the general powers and duties which may be exercised by city council as follows:

"Article II

"Powers Of Council—The Legislative Branch

*"Section 208. General powers and duties*

"All powers of the city not otherwise provided for in this charter shall be exercised in a manner to be determined by council. *Council shall provide for the exercise and performance of any such other powers and duties in a manner consistent with the terms of this charter."*

Therefore, what this court must decide is whether ordinance 29-97 was adopted by city council *"in a manner consistent with the terms of this charter."* Based upon our review of the entire home rule charter, we find that it was not. Although sections 215 through 220 of article II set forth the power, form, procedure, effective date, etc.,

relative to the passage of ordinances, there is no language to be found anywhere in article II from which this court could even remotely infer that city council has the legislative authority to place pending, but still not adopted or rejected, ordinances before the residents of the City of Reading for a vote. And this becomes emphatically clear when we read section 1204 of article XII of the home rule charter which contains the only reference whatsoever to city council on the subject of initiative and/or referendum and which provides as follows:

"Article XII

"General Provisions

"*Section 1204. Amendments.*

"The charter shall be *amended* by:

"(a) The *citizens* of the city through the *initiative* process provided by this charter;

"(b) C*ity council* through *referendum;* or

"(c) A *charter review commission* by amendments being placed on the ballot in accordance with section 1103 of this charter;

"(d) *Proposed amendments by a charter review commission being placed on the ballot in accordance with section 1203 of this charter.*"

When we read section 1204(b), we find that it clearly gives city council the power to commence the referendum process of giving city residents the right to approve or disapprove *amendments to the charter* and that this is the only situation in which city council has the authority to commence the referendum process. Accordingly, city council's action in the present situation is not only inconsistent with the terms and provisions of article XI, which specifically gives qualified voters the power to commence initiative and referendum proceedings involv-

ing legislative matters, but it is also inconsistent with article XII which specifically gives city council the power to commence referendum proceedings for the sole purpose of placing before the voters the amendments proposed by the charter review commission.

Had the citizens of the City of Reading intended to vest such legislative authority in city council, they would have clearly set forth that authority somewhere in the home rule charter. However, they chose not to do so. And although city residents can perhaps amend their home rule charter to provide this governmental power to the citizens upon the sole initiative of city council,[10] the fact remains that city council at the present time has no such legislative authority from its citizens. Therefore, we conclude that because city council did not have the legislative authority to adopt ordinance no. 29-97, it, as well as the results flowing from it, are null and void and of no legal effect.

Because of our decision on this fundamental issue, there is no need for this court to resolve the remaining arguments made by the parties. However, inasmuch as the charter review commission will, within the not too distant future, be engaged in determining what amendments, if any, should be recommended to the voters, we feel compelled to address the city's argument that the 2 to 1 "no" vote on May 19, 1998 is not binding on city council inasmuch as the placement of the question on the ballot was in violation of sections 36030 and 36050

---

10. We are not deciding whether such procedures would be a good way to run a government or whether the inclusion of such language under the home rule charter would be valid under Pennsylvania law inasmuch as those matters are not before us.

of the Third Class City Code.[11] That position has been expressly rejected by the Commonwealth Court of Pennsylvania within the last month in *Bell v. Lehigh County Board of Elections,* no. 801 C.D. 1999 (April 26, 1999). In that case, five qualified voters of the City of Allentown submitted 93 petitions to the city clerk, containing more than the required 2,000 signatures, seeking to place a voter initiative relative to the City of Allentown's Landlord Licensing Law on the May 18, 1999 primary election ballot, pursuant to the City of Allentown Home Rule Charter. Following the certification by the city clerk that enough signatures had been obtained, the Lehigh County Board of Elections agreed to place the initiative on the May 19, 1999 primary ballot. The appellant subsequently commenced an equity action seeking to have the trial court enjoin the placement of the question on the ballot, arguing that sections 36030 and 36050 of the Third Class City Code prohibited the use of the initiative process because it involved a matter of public health and safety. The trial court denied the appellant's request, which was affirmed by the Commonwealth Court on the basis of the trial court's opinion, which said:

"Unlike the Third Class City Code, the provisions for 'initiative and referendum' in the Allentown Charter do not exclude ordinances for the preservation of public health or safety. The charter does not contain any limitation on the subject matter of ordinances that can be placed on the ballot. Obviously, proposed ordinances may not contravene constitutional principles; nor may they cover matters prohibited under the Pennsylvania Home Rule Charter Law. However, neither the Pennsylvania Con-

11. Title 53, 53 P.S. §§36030 and 36050 (Supp. 1999).

stitution nor the Pennsylvania Home Rule Charter Law prohibits a home rule municipality from enacting public health or safety ordinances by vote of the electorate.

"Significantly, the Optional Third Class City Charter Law, under which the City of Allentown operated from 1970 to 1996, does provide that a city operating under that law may not exercise powers '[r]elating to public health' contrary to or in limitation or enlargement of powers granted under the Third Class City Code. 53 P.S. §41305(1)(xi). The fact that the legislature did not include a similar limitation when it later adopted the Pennsylvania Home Rule Charter Law is a clear indication that it intended *not* to so limit municipalities operating under this more recent law.

"Plaintiff argues that since the Allentown Charter does not limit the subject matter of ordinances eligible for initiative or referendum, the limitations contained in the Third Class City Code must still be alive. This argument overlooks the fact that Pennsylvania Home Rule Charter Law and the Allentown Charter *supersede* the Third Class City Code. The Pennsylvania Home Rule Charter Law gives home rule municipalities much greater power, to be liberally construed, subject only to certain specified limitations not here applicable.[12] The City of Allentown was free to adopt initiative and referendum procedures to the full extent of the broad grant of municipal authority given under the Pennsylvania Home Rule Charter Law.

---

12. These limitations include, inter alia, collection of municipal tax claims, eminent domain procedures, boundary changes, public schools, rates and subjects of taxation, assessment of property for taxation, defining or providing for punishment of any felony or misdemeanor, and municipal planning.

"We believe that when city voters adopted a home rule charter with 'initiative and referendum' procedures and placed no restriction on the subject matter of these procedures, they intended these procedures to be available to the full extent of the city's authority under the Pennsylvania Home Rule Charter Law. Since this law does not limit municipal power in the areas of public health and safety, it would be improper to read any such limitations into the initiative and referendum provisions of the Allentown Charter."

Finally, this court, keeping in mind the advice of Justice Thurgood Marshall, that "[w]e must never forget that the only real source of power we as judges can tap is the respect of the people," [13] fully recognizes that its decision in this case will in all likelihood be unpopular with those fine citizens of the City of Reading who voted overwhelmingly against proposed ordinance no. 30-97 on May 19, 1998. They may feel that this court is not being fair to the trash haulers or that this court is somehow saying to the citizens of the City of Reading that their vote did not count and, therefore, that it is overturning their vote and wishes. However, it should be understood that the court's role in this case is the same as in all matters before it involving citizens against their government . . . and that is to simply decide whether the latter acted in accordance with the rule of law . . . for otherwise a democracy cannot survive.[14] Having determined that the

---

13. *Chicago Tribune,* August 15, 1981.

14. Moreover, this court has no opinion as to whether private or public trash collection is in the best interests of the citizens of the City of Reading because that is not a matter for the judiciary to decide but instead is only for the considered judgment of the legislative branch (here the city council) and the executive branch (here the mayor) of our tripartite form of government.

government of the City of Reading did not and perhaps that it even tried to abdicate or pass off to the public its legislative responsibility, this court has no alternative but to enter the following attached decree nisi.

## DECREE NISI

And now, May 20, 1999, the plaintiffs having failed to clearly establish that city council had the legislative authority to adopt ordinance no. 29-97 pursuant to the provisions of the home rule charter, the Third Class City Code and/or the Pennsylvania Constitution, it is hereby ordered that the vote on this "referendum" question in the May 19, 1998 primary was regretfully a meaningless nullity and of no legal effect. Therefore, the plaintiffs' complaint requesting prohibitory relief in the form of a permanent injunction is denied.