**WEST PENN SPECIALTY MSO, INC., a Pennsylvania Corporation, and Medical Center Clinic, P.C., a Pennsylvania Corporation, Appellees,**

v.

**Teresa A. NOLAN, M.D., Appellant.**

Superior Court of Pennsylvania.

Argued March 4, 1999.

Filed Aug. 24, 1999.

Reargument Dismissed Sept. 23, 1999.

Richard B. Tucker, III, Pittsburgh, for appellant.

Joseph Leibowicz, Pittsburgh, for appellees.

Robert B. Hoffman, Harrisburg, for participating parties.

Before JOHNSON, FORD ELLIOTT, and ORIE MELVIN, JJ.

JOHNSON, J.:

¶ 1 Teresa A. Nolan, M.D., appeals from the chancellor's order imposing a preliminary injunction to enforce non-compete clauses incident to Nolan's former employment with Medical Center Clinic, P.C. (MCC), a medical practice owned by West Penn Specialty MSO, Inc. (West Penn). Nolan argues that the court erred in imposing the injunction because the injury sustained by MCC is compensable in damages and because the injunction adversely affects the public interest. We conclude that the record demonstrates a reasonable basis for the chancellor's action, and accordingly, we affirm the order imposing the preliminary injunction.

¶ 2 This matter arises out of West Penn's purchase in 1997, of Medical Center

Clinic, Ltd. (MCCL), a Pittsburgh medical practice specializing in the treatment of cancer (oncology) and diseases of the blood (hematology). West Penn initiated the purchase as part of a consolidation of Pittsburgh oncology practices prompted by changing treatment patterns under managed care. Pursuant to the parties' Asset Purchase Agreement, West Penn paid MCCL's shareholders a total of $1,500,000, approximately $1,250,000 of which was designated payment for good will. Following the purchase, West Penn created MCC out of the assets of MCCL to employ the six MCCL physicians and administer their practices. In consideration of the sale, all MCCL physicians, including Dr. Nolan, executed employment agreements, consenting to practice medicine only as employees of MCC. Both West Penn's Asset Purchase Agreement and MCC's individual employment agreements contained restrictive covenants, in accordance with which, each of the physicians agreed not to compete with MCC during the term of the agreement or for one year after its expiration. These provisions, known as "non-competes," operated to limit the practice of any physician who left MCC during the life of the respective agreements by prohibiting him or her from practicing medicine, "directly or indirectly," within ten miles of the primary site at which the doctor had practiced while employed by MCC.

¶ 3 All parties acknowledge that Dr. Nolan left MCC within approximately six months after executing the asset purchase and employment agreements, and four and one half years prior to expiration of the agreed term of employment. While employed by MCC, Nolan conducted her practice primarily at Forbes Regional Hospital (Forbes) in Monroeville, Allegheny County, and served the majority of all patients at that site. Forbes was, at all times relevant, an affiliate of Allegheny General Hospital (AGH). AGH was, and remains, a competitor of West Penn's parent entity, The Western Pennsylvania Hospital. Upon leaving MCC, Dr. Nolan asserted that following West Penn's acqui-

sition of MCCL, Forbes' management had threatened her repeatedly with a loss of referrals from Forbes' primary care physicians. Subsequently, Dr. Nolan joined a competing practice aligned with Forbes and AGH.

¶ 4 In recognition of the non-competes in her respective agreements with West Penn and MCC, Nolan moved her office beyond a ten-mile radius of Monroeville to Greensburg, Westmoreland County, but announced her intention to return to Monroeville within one year. Consequently, West Penn and MCC commenced this action in equity, seeking, *inter alia,* injunctive relief prohibiting Dr. Nolan from returning to practice within the proscribed area for the remainder of her five-year term of employment plus one year. In New Matter, Dr. Nolan asserted the defense of "unclean hands," alleging that following her departure, pending publication of her new address, MCC refused to respond truthfully to patients' inquiries concerning Dr. Nolan's whereabouts, despite knowledge of her new location and telephone number. Accordingly, Nolan argues that the plaintiffs are barred from equitable relief.

¶ 5 The matter proceeded in the trial court before the Honorable Judith L.A. Friedman. Judge Friedman convened an evidentiary hearing, at the conclusion of which the court determined that Dr. Nolan had breached her agreements with West Penn and MCC, and that the resulting injuries to the plaintiffs were not adequately compensable in damages. Consequently, the court entered a preliminary injunction restricting Dr. Nolan's practice within the designated area for the life of the parties' agreements. The injunction provides, in pertinent part:

> Defendant Teresa A. Nolan, M.D. is preliminarily enjoined from practicing medicine directly or indirectly or acting adversely to the interests of [West Penn] and MCC within a ten-mile radius of the current Monroeville office of [MCC,]

hereinafter, the Restricted Area, until an Adjudication is issued after a final hearing or until May 31, 2003, whichever comes first. Under this Order, the practice of medicine "directly or indirectly" expressly includes Dr. Nolan's continuing to direct, recommend, refer, or admit patients to Forbes Regional Hospital or its successor, or the Monroeville offices of [her current practice] for treatment by [her current practice] or to any other physicians or health care providers in the restricted area other than MCC physicians.

[I]n the event the patient chooses to exercise his or her right to treat with [Dr. Nolan's current practice] at Forbes Regional Hospital in Monroeville or with any oncologist or oncology group other than plaintiff MCC within the Restricted Area, Dr. Nolan may not continue to serve as that patient's oncologist pending further Order of Court.

Order of Court, 6/17/98, at 3–4.

¶ 6 In response to the injunction, Dr. Nolan filed this appeal raising two issues for our review:

1. Whether the trial court erred in issuing the preliminary injunction because the injunction is overly broad and adverse to the public interest, there is no immediate and irreparable harm threatening the plaintiffs, and greater harm will result from the injunction's issuance than its refusal?

2. Whether the trial court erred in issuing the injunction because the plaintiffs had "unclean hands?"

Brief for Appellant at 5.

¶ 7 A preliminary injunction operates to maintain affairs between the parties as they existed prior to the underlying dispute and "to compel a wrongdoer to give up the status he appropriated before an action could have been instituted against him." *Herman v. Dixon*, 393 Pa. 33, 36, 141 A.2d 576, 577 (1958). Thus, prior to imposing a preliminary injunction,

the court must determine whether the activity to be restrained is actionable, and reasonably subject to abatement by issuance of the injunction requested. *New Castle Orthopedic Assoc's v. Burns*, 481 Pa. 460, 464, 392 A.2d 1383, 1385 (1978). Should the court so find, it may enter the injunction to enforce a restrictive covenant only where the record establishes the following prerequisites:

[f]irst, [the injunction] is necessary to prevent immediate and irreparable harm which could not be compensated by damages; second, that greater injury would result by refusing it than by granting it; and third, that it properly restores the parties to their status as it existed immediately prior to the alleged wrongful conduct.

*Id.* at 463–64, 392 A.2d at 1385. In addition, where the covenant in question seeks to limit the professional practice of a physician, the court must scrutinize the effect of the resulting loss of medical services on the public interest. *Id.*

¶ 8 Our review of a trial court's order granting an injunction is limited and circumspect. We are bound by the chancellor's findings of fact, and may not revisit the merits of the underlying controversy. *Sovereign Bank v. Harper*, 449 Pa.Super. 578, 674 A.2d 1085, 1091 (1996). Accordingly, our consideration is limited to whether the record demonstrates "any apparently reasonable grounds" for the trial court's action. *Id.* at 1091. We may interfere with the chancellor's decision only if the certified record reveals that no grounds exist to support the decree, or that the rule of law upon which the court relied was palpably erroneous or misapplied. *Id.*

¶ 9 In this case, Judge Friedman found that the harm West Penn sought to avoid would be irreparable because the disruptive effect of Dr. Nolan's departure on MCC's current or future patient relationships "is inherently unascertainable" and "cannot be quantified." Memorandum in Support of Order, 6/17/98, at Conclusions

of Law ¶¶ 62, 84, 89. Dr. Nolan argues, *inter alia,* that Judge Friedman's finding was without reasonable grounds because West Penn had previously assigned a value to intangible assets of the practice in the form of goodwill when it consummated the Asset Purchase Agreement. Brief for Appellant at 24. Without further discussion, Nolan concludes that "[West Penn] and MCC cannot now assert that the loss of such intangibles constitutes an irreparable injury . . . ." *Id.*

■ ¶ 10 We have recognized that "[t]he purpose sought to be achieved by the issuance of a preliminary injunction is 'the avoidance of irreparable injury or gross injustice until the legality of the challenged action can be determined.' " *All–Pak, Inc. v. Johnston,* 694 A.2d 347, 350 (Pa.Super.1997) (citation omitted). "An injury is regarded as 'irreparable' if it will cause damage which can be estimated only by conjecture and not by an accurate pecuniary standard." *Sovereign Bank,* 674 A.2d at 1091. Our courts have held, accordingly, that "[i]t is not the initial breach of the covenant which necessarily establishes the existence of irreparable harm but rather the unbridled threat of the continuation of the violation," and incumbent disruption of the employer's customer relationships. *John G. Bryant Co. v. Sling Testing and Repair,* 471 Pa. 1, 8, 369 A.2d 1164, 1167 (1977).

■ ¶ 11 Thus, grounds for an injunction are established "where the plaintiff's proof of injury, although small in monetary terms, foreshadows the disruption of established business relations which would result in incalculable damage should the competition continue in violation of the covenant." *New Castle Orthopedic Assoc's,* 481 Pa. at 466, 392 A.2d at 1386. The effect of such disruption may manifest itself in a loss of new business not subject to documentation, the quantity and quality of which are "inherently unascertainable." *Id.* at 8, 369 A.2d at 1167. *See also Courier Times, Inc. v. United Feature Syndicate,* 300 Pa.Super. 40, 445 A.2d 1288, 1296

(1982) (affirming finding of irreparable harm upon syndicate's cancellation of newspaper's subscription to popular comic strip because absence of feature would place paper at competitive disadvantage in attracting new customers). Consequently, "the impending loss of a business opportunity or market advantage [also] may be aptly characterized as an 'irreparable injury' " for purposes of equitable relief. *Sovereign Bank,* 674 A.2d at 1093.

■ ¶ 12 Upon review of the record, we conclude that the evidence sustains Judge Friedman's finding that Dr. Nolan's defection from MCC both damaged MCC's existing patient relationships and imposed a substantial competitive disadvantage on MCC and West Penn. Initially, when Dr. Nolan departed MCC, approximately 125 patients, for whose continued patronage West Penn had paid, elected to follow her. This disruption, fostered by the strength of Dr. Nolan's relationships with MCC patients, reasonably foreshadowed a continuing exodus of those patients had Dr. Nolan been free to see them without the restrictions of time and distance. *See John G. Bryant Co.,* 471 Pa. at 8–9, 369 A.2d at 1168 (reasoning that because customer may come to regard attributes of employee as more important to his dealings than services of employer, some customers may be very willing to abandon employer should employee move to a competing organization). Because the potential extent of the resulting drain on MCC's patient base cannot be estimated with any degree of certainty, it clearly would pose a source of injury not calculable by an "accurate pecuniary standard." *Sovereign Bank,* 674 A.2d at 1091.

¶ 13 Moreover, the record demonstrates that Dr. Nolan's departure signaled a significant loss of business opportunity and market advantage. *Id.* at 1093. Dr. Nolan treated a substantial majority of MCC's patients at Forbes Regional Hospital, and she enjoyed a reputation as one of Forbes' leading oncologists. In-

deed, her position at Forbes was so strong that her practice accounted for several times the combined total of the other two MCC physicians who practiced at that site. Significantly, her referrals at Forbes continued to increase even after West Penn's purchase of the MCCL practice. This increase, in view of Dr. Nolan's already substantial practice at Forbes, establishes, beyond conjecture, that her abandonment of MCC and realignment with AGH/Forbes would place West Penn at a substantial competitive disadvantage in achieving a significant presence at Forbes. This is particularly so in view of the fact that the practice of which Dr. Nolan is now a member opened an office one floor below that of MCC when Dr. Nolan began her employment. Dr. Nolan's presence in that office, competing for her former patients directly with MCC, would clearly impact, if not devastate, MCC's practice. Accordingly, Dr. Nolan's conduct is properly the object of a preliminary injunction, and we find no error in Judge Friedman's determination of irreparable harm.

¶ 14 Dr. Nolan also argues that the injunction is adverse to the public interest and that greater harm will result from its issuance than from refusing it. Specifically, she contends that adversity is manifest in provisions of the injunction that limit her ability to see patients within the restricted area or to refer patients in need of procedures to facilities or physicians within the restricted area, other than MCC physicians. Dr. Nolan concludes that such restrictions unnecessarily impact the rights of her patients to seek the most desirable or convenient treatments for their illnesses. Judge Friedman concluded that while Dr. Nolan's patients "clearly are deserving of great sympathy," Dr. Nolan had failed to demonstrate the level of public adversity required by our law to contravene entry of the injunction. Memorandum in Support of Order, 6/17/98, at Conclusions of Law ¶¶ 91–96.

¶ 15 In the context of non-compete agreements amongst physicians, our Supreme Court has defined the public interest as a function of the availability of appropriate medical service to the community should an injunction be imposed. In *New Castle Orthopedic Assoc's, supra,* the Court reasoned:

> [p]aramount to the respective rights of the parties to the covenant must be its effect upon the consumer who is in need of the service. This is of particular significance where equitable relief is being sought and the result of such an order or decree would deprive the community involved of a desperately needed service.

*Id.* at 468–69, 392 A.2d at 1387–88 (plurality opinion) (Pomeroy, Nix and Manderino, JJ.). Thus, to determine the extent of the public's interest the Court measured the impact of the proposed deprivation on the availability of comparable medical care within the restricted area. *Id.* at 468, 392 A.2d at 1387. If the public demand for the abilities of physicians specialized in the care offered by the restricted doctor outstripped the ability of other doctors in that area to provide expeditious treatment, the public interest would outweigh the rights of the plaintiff and the injunction would be dissolved. The Court concluded, accordingly, that where patients seeking orthopedic treatment experienced delays of four weeks to four months to see the only other orthopedic surgeon in the restricted area, the public interest in adequate medical care overcame the plaintiff's right to an injunction. *Id.* at 1388 (Pomeroy, Nix and Manderino, JJ.; Eagen, C.J., and Larsen, J. concurring in result).

¶ 16 Dr. Nolan argues that we should not interpret the reasoning in *New Castle Orthopedic Assoc's* to limit the public interest in medical care based solely on adequate substitute treatment by another physician. Rather, she argues, evaluation of the public interest must include "a patient's right to choose a health care provider, to maintain a continuous relationship with that healthcare provider, and to receive the best medical services available without forfeiting that relationship." Brief

for Appellant at 22. *See also* Brief of the Pennsylvania Medical Society and the American Medical Association as *Amici Curiae* in Support of Appellant Theresa A. Nolan, M.D., at 16. However, neither Dr. Nolan nor *Amici* have produced any evidence to support their expansive definition of the public interest, nor have they cited any authority, either decisional or legislative, to support the analysis they urge us to adopt. Indeed, *Amici* concede that no jurisdiction has recognized a public interest in assuring the unrestricted ability of a particular patient in continuity of care with a single physician. In the absence of a compelling argument, documented by facts of record demonstrating the inadequacy of the current measure of the public interest, we cannot and will not look beyond the standard applied by our Supreme Court in *New Castle Orthopedic Assoc's.*

¶ 17 Moreover, we cannot accept Dr. Nolan's assertion that *New Castle Orthopedic Assoc's* does not limit the measure of the public interest based on quantity. Though, as Dr. Nolan argues, that decision does not hold expressly that a sufficient number of qualified physicians in the restricted area necessarily satisfies the public interest, the Court did rely on decisions from other jurisdictions that do so hold. *See Middlesex Neurological Assoc's, Inc. v. Cohen,* 3 Mass.App.Ct. 126, 324 N.E.2d 911 (1975) (enjoining neurosurgeon from practicing in restricted area where area did not need another neurosurgeon); *Horne v. Radiological Health Services,* 83 Misc.2d 446, 371 N.Y.S.2d 948 (Sup.Ct., Special Term.1975) (enforcing non-compete against radiologist where sufficient number of radiologists already served restricted area); *Cogley Clinic v. Martini,* 253 Iowa 541, 112 N.W.2d 678 (Sup.Ct.1962) (enforcing non-compete against orthopedic surgeon where over 460 other physicians, many practicing orthopedics, served restricted area). We conclude that in applying the public interest analysis espoused in these jurisdictions, our Supreme Court effectively defined the quantitative sufficiency of physicians practicing in the restricted

area as the measure of the public interest. Consequently, we find no error in the trial court's application of the law.

¶ 18 Similarly, we find ample support in the record for the court's findings of fact concerning the number of oncologists practicing in the restricted area. The record shows that, prior to Dr. Nolan's break with MCC, there were 96 oncologists practicing in West Penn's five-county service area. At least four oncologists, other than Dr. Nolan, practiced at Forbes Regional Hospital—two from MCC and two from Dr. Nolan's current practice. Moreover, Dr. Nolan does not contend that she is the only competent oncologist within the restricted area. Judge Friedman concluded accordingly that "[t]here is no evidence of a shortage of oncologists within ten miles of Forbes nor is there evidence that a shortage of oncologists would develop should Dr. Nolan comply with her contractual obligations." Memorandum in Support of Order, 6/17/98, at Conclusions of Law ¶¶ 94. Based on the record before us, we find that the evidence provides reasonable grounds for the trial court's action. *See Sovereign Bank,* 674 A.2d at 1091. Consequently, we find no error in the court's imposition of the preliminary injunction or in the scope of that injunction.

¶ 19 In her second issue, Dr. Nolan asserts that West Penn and MCC should be barred from equitable relief because they appeared before the court with "unclean hands." Nolan contends that MCC and its physicians violated ethical precepts of the American Medical Association because they failed to provide patients who contacted their offices seeking Dr. Nolan with her new address and telephone number, despite the fact that she had provided same to MCC. In support of this contention, Dr. Nolan produced the affidavits of several patients who attested that on a series of dates after December 10, 1997, until January 2, 1998, they called MCC and were apprised that the practice

had no knowledge of Dr. Nolan's where-abouts.

¶ 20 Though we recognize, as did Judge Friedman, that there is no basis to suspect the veracity of these patients' accounts, we are unable to ascribe their experiences to unethical or improper conduct on the part of MCC. Judge Friedman concluded that this "notice problem" was a product of short-lived confusion precipitated by Dr. Nolan's own failure to provide contact information to MCC in a timely fashion after her departure. We find nothing in the record to contradict this conclusion. In point of fact, the record establishes that Dr. Nolan herself never provided contact information to anyone at MCC. R.R. at 1305a–06a. Though this information was eventually provided through a defecting MCC employee on December 29, 1997, Dr. Nolan had no personal knowledge of the exchange. *Id.* Moreover, the telephone number the employee provided to MCC was not operable until January 8, 1998, almost one week after the latest occasion on which any patient avers having been denied a telephone number by MCC. R.R. at 1306a. Accordingly, Dr. Nolan's allegation of "unclean hands" is not substantiated by the facts of record. Consequently, we find no error in Judge Friedman's disposition of this issue.

¶ 21 For all of the foregoing reasons, we affirm the order of the trial court imposing a preliminary injunction.

¶ 22 Order **AFFIRMED**.

.

¶ 23 Judge ORIE MELVIN files a Dissenting Opinion.

ORIE MELVIN, J., dissenting:

¶ 1 I believe the trial court erred in issuing the preliminary injunction because greater harm is worked by the issuance of this injunction than would result from its denial. Accordingly, I dissent.

¶ 2 The preliminary injunction at issue in this case provides as follows:

It is therefore ORDERED, ADJUDGED AND DECREED that Defen-dant Teresa A. Nolan, M.D. is preliminarily enjoined from practicing medicine directly or indirectly or acting adversely to the interests of MSO and MCC within a ten-mile radius of the current Monroeville office of Plaintiff MCC, hereinafter, the Restricted Area, until an Adjudication is issued after a final hearing or until May 31, 2003, whichever comes first. Under this Order, the practice of medicine "directly or indirectly" expressly includes Dr. Nolan's continuing to direct, recommend, refer, or admit patients to Forbes Regional Hospital or its successor, or the Monroeville offices of OHA for treatment by OHA or to any other physicians or health-care providers in the Restricted Area other than MCC physicians.

It is further ORDERED that Dr. Nolan, at her sole expense in language satisfactory to Plaintiffs or to this Court, shall inform all of her current and future patients that, *in the event the patient chooses to exercise his or her right to treat with OHA at Forbes Regional Hospital in Monroeville or with any oncologist or oncology group other than Plaintiff MCC within the Restricted Area, Dr. Nolan may not continue to serve as that patient's oncologist pending further Order of Court.* (emphasis added).

¶ 3 When considering whether to issue a preliminary injunction, one of the most important factors to be taken into account is whether greater harm is caused by issuing the injunction than by refusing it. *School District of Wilkinsburg v. Wilkinsburg Education Association*, 542 Pa. 335, 339, 667 A.2d 5, 7 (1995). Moreover, "where an adverse effect upon the public interest will result from granting a preliminary injunction, it should not be granted." *Id.* (quoting *City of Philadelphia v. District Council 33*, 112 Pa.Cmwlth. 90, 535 A.2d 231 (1987), *affirmed* 528 Pa. 355, 598 A.2d 256 (1991)). In the context of restraints on physicians our courts apply close judicial scrutiny because of the value

of physicians' services to the community. *New Castle Orthopedic Associates v. Burns*, 481 Pa. 460, 464, 392 A.2d 1383, 1385 (1978).

¶ 4 In this case the trial court fashioned an injunction which went beyond enforcing the restrictive covenant against Dr. Nolan. The injunction specifically restricts the actions of her patients. The injunction in this case goes far beyond requiring patients to drive an extra distance in order to continue treatment with Dr. Nolan. This directive infringes on the rights of Dr. Nolan's patients by preventing them from seeking ancillary treatment and services from other health care providers in the restricted area. It was not enough for the trial court to restrict the patients' relationship with Dr. Nolan, the court restricted patients' rights to obtain medical services with other physicians. Pursuant to the injunction, if patients exercise their rights to treat with any other oncology group other than MCC, they cannot continue to treat with Dr. Nolan. Such a restriction creates scenarios where patients cannot undergo such rudimentary procedures as giving blood without the risk losing their doctor. I find this restriction entirely too broad.

¶ 5 The rights of patients to seeks ancillary medical care from other physicians is deserving of more attention from the law than appellees' expectation of profit from its commercial transaction with Dr. Nolan. While I recognize appellees, like any business, can contract with others, including Dr. Nolan, in such a way as to protect its financial interests, the injunction goes beyond protecting such interests. Dr. Nolan's patients are not the property or chattel of appellees. Nor are they in privity with appellees. In this case, I believe greater harm is caused by issuing the injunction than by refusing it. I would reverse the decision of the trial court.