## Elfman v. Berman

*Richard Feldman,* for plaintiffs.

*Herman P. Weinberg, Sarah E. Davies, Daryl Caplan* and *H. Thomas Hunt III,* for defendants.

HERRON *J.,* May 8, 2001—Plaintiffs-petitioners Joel Elfman DDS and Pennsylvania Federation Brotherhood of Maintenance of Way Employees (Penn Fed) lease office space in the defendants' building. On April 4, 2001, the City of Philadelphia Department of Licenses and Inspections (L&I) issued cease operations orders for the building due to violations of the city's fire prevention and building codes. The plaintiffs are now locked out of their offices. The plaintiffs each petitioned for a preliminary injunction ordering their landlord to repair the building. The court grants the petitions. The following findings of fact, discussion and conclusions of law support the court's contemporaneous order.

### FINDINGS OF FACT

### I. *The Parties*

(1) Dr. Elfman and Penn Fed lease office space in a high-rise building at 1930 Chestnut Street, Philadelphia, Pennsylvania. P-3; Pa.Fed.-1.

(2) Defendant Arnold Berman owned the building until March 31, 2001 and was the plaintiffs' original landlord. N.T.[1] 17; P-3; Pa.Fed.-1.

---

1. All references to Notes of Testimony (N.T.) are to testimony and oral argument at the April 12, 2001 hearing on the plaintiffs' petitions.

(3) Defendant 1930-34 Associates, a limited partnership, bought the building on March 31, 2001 and is the plaintiffs' current landlord. N.T. 17-18, 21, 52-53, 63; P-6; P-10; D-1.

(4) Defendant 1930-34 Corporation is the general partner of 1930-34 Associates. N.T. 66.

(5) Defendant Turchi is the sole principal of 1930-34 Associates. N.T. 21-22, 29, 76, 96.

## II. *Dr. Elfman's Lease*

(6) Dr. Elfman conducts a pediatric dental practice out of his office on the 19th floor of the building. N.T. 12-13; P-3.

(7) Dr. Elfman has treated more than 4,400 patients out of his office in the building over the last two years. He has one associate dentist and 14 other employees. N.T. 14.

(8) Dr. Elfman's has a seven-year lease with a term beginning July 9, 1996 and ending June 30, 2003, with an option to renew for three more years. P-3.

(9) In Dr. Elfman's lease, the landlord covenanted to:

(a) Provide elevator service Monday through Friday from 8 a.m. to 8 p.m. Saturday from 8 a.m. to 4 p.m.

(b) Provide heat and air conditioning as reasonably necessary Monday through Friday from 8 a.m. to 8 p.m. and Saturday 8 a.m. to 1 p.m.

(c) Clean the leased premises and common areas of the building. P-3, §7(a).

(10) The Elfman lease provided Dr. Elfman with a right of quiet enjoyment of the leased premises. P-3, §37.

(11) A separate provision in the lease, entitled "quiet enjoyment," provides that Dr. Elfman shall have the right "to remain as lessee of the premises notwithstanding the sale . . . of the building." P-3, §48.

(12) The lease provides that, in the event of sale of the building, the purchaser would assume and agree to carry out any and all covenants and obligations of the lessor. P-3, §37(a).

### III. *Penn Fed's Lease*

(13) Penn Fed's offices are on the 6th floor. N.T. 84.

(14) Penn Fed is a labor union representing, among others, workers who construct and maintain railroad tracks. Penn Fed has about 5,000 members. Penn Fed negotiates, administers and enforces collective bargaining agreements between its members and their employees and represents its members in grievance proceedings. N.T. 84.

(15) Penn Fed maintains over 75 four-drawer filing cabinets in the building. Penn Fed requires continuous and daily access to these files to perform its duties to its members. N.T. 97.

(16) Penn Fed has a lease that runs until September 30, 2004. Pa.Fed.-1.

(17) In Penn Fed's lease, the landlord covenanted to:

(a) Provide heat as necessary between October 10 and May 20 of each year.

(b) Keep in operation during normal working hours, except Sundays and legal holidays, at least one elevator.

(c) Clean the leased space.

(d) Provide water for drinking, lavatory and toilet purposes. Pa.Fed.-1, §12.

(18) Until the locks of the building were changed on Match 31, 2001, Penn Fed had a key to the front door and 24-hour access to the building. N.T. 97.

## IV. *Conditions During Berman's Ownership*

(19) Under Berman's ownership, conditions in the building deteriorated. N.T. 86.

(20) Only one of the building's four elevators works. The one working elevator breaks down often and has no working emergency telephone. N.T. 18.

(21) Cleaning services stopped in July 2000. N.T. 19.

(22) The City of Philadelphia Department of Licenses and Inspections and the Fire Department cited Berman for code violations including electrical wiring problems, fire alarm dysfunction due to unpaid phone bills, debris blocking building exits, and falling exterior masonry. N.T. 107, 109-10; D-1.

(23) At least three times the city issued cease operations orders requiring the building to be shut for one to three days. N.T. 19-20, 112.

(24) On February 20, 2001, Dr. Elfman filed this action against Berman. P-5.

## V. *Conditions During Turchi's Ownership*

(25) Turchi intends to convert the entire building to residential use but cannot do so while plaintiffs' leases are in effect. To circumvent the plaintiffs' leases and remove the plaintiffs, Turchi intentionally allowed the

building to fall into disrepair such that L&I would order closure of the building. The court makes this finding based on Turchi's admissions to his tenants, his knowledge of the tenants' leases and his knowledge of the neglected condition of the building. In January 2001, Turchi told Dr. Elfman and his staff that he would be the building's new owner, that the building was unsafe, that he planned to gut the building and convert it to residential units, and that all tenants would be forced to leave. N.T. 21-22, 39. On February 22, 2001, Dr. Elfman's counsel hand-delivered to Turchi's counsel copies of the complaint in *Elfman v. Berman,* the Elfman lease and notices of building code violations that the L&I issued to Berman. N.T. 25; P-5. In February or March 2001, Turchi told a Penn Fed employee, Rae Ann Carson, that he would gut the building and convert it to residential units and that all tenants would have to leave. N.T. 96.

(26) On March 31, 2001, 1930-34 Associates became owner of the building. N.T. 17-18.

(27) On Saturday March 31, 2001, the locks of the building were changed and Dr. Elfman had to cancel his patients' appointments for that day. A sign on the door read:

Building Hours
7:30 a.m.—6:00 p.m.
Monday Thru Friday
The Doors Will Be Locked
At All Times
You Will Not Have Access
Without A Copy Of A Valid
Lease

P-4; N.T. 25.

(28) On Monday, Tuesday and Wednesday, April 2-4, 2001, the building's security guards permitted Dr. Elfman, his staff and his patients to enter the building. N.T. 26-30.

(29) Neither Dr. Elfman nor Penn Fed has a key to the new locks. N.T. 26-30, 97.

(30) On Tuesday evening, April 3, 2001, the water stopped working in the building. N.T. 29-30.

## VI. *The Cease Operations Orders*

(31) On Wednesday, April 4, 2001, an L&I inspector inspected the building. The L&I inspector issued two cease operations orders around noon. The cease operations orders cited violations of the Fire Prevention Code and Property Maintenance Code. N.T. 30; P-10.

(32) L&I posted two cease operations notices on the front door of the building. The notices prohibited occupancy after noon, April 4, 2001. The first notice cited violations of the city's electrical, plumbing and fire codes, with the explanation: "No Sprinkler. System Down (No Water)." In a box captioned "corrective actions needed to remove this/these condition:" the notice stated "Correct Violation." N.T. 125; cease operations notices.[2]

(33) The second notice cited violations of the city's electrical and plumbing codes, with the explanation "No

---

2. The two cease operations notices were not part of the record of the April 12, 2001 hearing. The city solicitor's office submitted copies of the notices to the court after the hearing. In their post-trial memoranda, however, all parties adopted the notices submitted by the city solicitor as the notices posted on the building on April 4, 2001 and referred to at the hearing.

Water." In the box captioned "corrective actions needed to remove this/these condition:" the notice stated "Correct Violation." Cease operations notices.

(34) L&I required the tenants to leave the building. The building remains closed. N.T. 30, 132; cease operations notices.

(35) The water system has a gravity fed tank on the 22nd floor. A pump fills the tank. The tank feeds water into the building. The tank is supposed to be sealed. N.T. 115-16.

(36) City inspectors and an engineer hired by 1930-34 Associates inspected the water system. The pump does not work. The tank has no cover. There are dirt and rust in the tank. Bird droppings are on the side of the tank. N.T. 79-80, 115-16.

(37) With no water for flushing, human waste has accumulated in the building's toilets. N.T. 33.

(38) The heat is turned off in the building. N.T. 53.

(39) There is garbage in the common areas of the building. N.T. 33.

(40) The April 4 closing of the building harmed and continues to harm Dr. Elfman. Since April 10, 2001, Dr. Elfman has conducted his practice out of a temporary space in another dentist's office. The temporary space is not satisfactory. It is not set up for pediatric dentistry. There are fewer dental chairs. The space is available for fewer hours per week than Dr. Elfman needs. Because of these unsatisfactory conditions, Dr. Elfman has referred about half of his patients to other dentists. N.T. 31-33.

(41) The April 4 closing of the building harmed and continues to harm Penn Fed. Since losing its office, Penn Fed has relocated to a much smaller office with fewer phone lines. Penn Fed's files, computers, copiers and fax machines remain in the building. Penn Fed can only access its files by making an appointment with the defendants.[3] That access is not sufficient, and Penn Fed is in danger of not being able to fulfill its obligations to its members. Though Penn Fed is negotiating for new office space in another building, that space will not be available until the end of May. N.T. 89-91.

(42) On Friday, April 6, 2001, Dr. Elfman amended the complaint against Berman to include John Turchi and John Turchi Partnership—which Dr. Elfman later learned is called 1930-34 Associates—as defendants, and filed a petition for a temporary restraining order and preliminary injunction. On the same day, the court issued a temporary restraining order directing Turchi and the John Turchi Partnership "to take all steps necessary to immediately restore the supply of water to the building; . . . to contact the City of Philadelphia Department of Licenses and Inspections to request the reopening of the building immediately upon the supply of water being restored; [and] immediately take all steps, once the water is restored to certify the sprinkler system." Dr. Elfman posted $1,000 bond. Exhibit P-4.

(43) Apart from hiring the engineer to inspect the water tank, defendants have done nothing since April 6, 2001

---

3. In their post-hearing brief 1930-34 Associates and 1930-34 Corporation allege that Penn Fed has since removed its belongings from the building. The court cannot make a finding based on facts alleged in the brief.

to fix the pump, clean and seal the tank, certify the sprinkler system, remedy the violations cited by L&I or secure the re-opening of the building. N.T. 79-80.

(44) If the conditions cited in the cease operations orders were corrected, and no further cease operations orders were issued, L&I would allow the building to re-open for business. N.T. 141.

## DISCUSSION

### I. *Turchi and 1930-34 Associates Waived Any Objection to Improper Service of Dr. Elfman's Amended Complaint*

In their post-hearing pleadings, Dr. Turchi and 1930-34 Associates objected for the first time to the service of Dr. Elfman's complaint. The court overrules the objection. "Once a party takes action on the merits of a case, he waives his right to object to defective service of process." *Ball v. Barber,* 423 Pa. Super. 358, 361-62, 621 A.2d 156, 158 (1993). Before objecting to service, counsel for the defendants entered into a stipulation of facts on the merits of the case, appeared at the preliminary injunction hearing, cross-examined Dr. Elfman's witnesses, and made oral argument on the merits of Dr. Elfman's case. By appearing and participating in the merits of the case without objecting to defective service, the defendants waived the objection and recognized the court's jurisdiction. *Peterson v. Philadelphia Suburban Transportation Co.,* 435 Pa. 232, 242, 255 A.2d 577, 583 (1969) ("[O]ne can waive [improper] service of process by various means, and become a party to a suit by volun-

tary appearance."); *Weaver v. Martin,* 440 Pa. Super. 185, 193, 655 A.2d 180, 184 (1995) (holding that defendant became party to an action by voluntarily entering an appearance before filing preliminary objection to improper service of process); *Ball,* 423 Pa. Super. at 362, 621 A.2d at 158 (holding that defendant waived an objection to defective service by filing a notice of deposition before filing preliminary objections to service); *Cinque v. Asare,* 401 Pa. Super. 339, 343, 585 A.2d 490, 492 (1990) ("Defects in service of process must be raised in preliminary objections" and are waivable).

## II. *The Court Grants the Petitions for Preliminary Injunction*

The plaintiffs ask the court to issue a preliminary injunction ordering Turchi, 1930-34 Associates and 1930-34 Corporation (together, the Turchi defendants) to comply with the terms of the leases. The court grants the preliminary injunction.

### A. Standard for Preliminary Injunction

To be entitled to a preliminary injunction, a petitioner must satisfy a four-part test: (1) the petitioner has a clear right to relief; (2) the preliminary injunction is necessary to prevent immediate and irreparable harm that cannot be compensated by monetary damages; (3) a greater injury will result by refusing to issue the injunction; and (4) the injunction will restore the parties to the status quo as it existed prior to the wrongful conduct. *Valley Forge Historical Society v. Washington Memorial Chapel,* 493 Pa. 491, 500, 426 A.2d 1123, 1128 (1981);

*Greco v. Hazleton City Authority,* 721 A.2d 399, 401 (Pa. Commw. 1998). In addition, before any injunction issued becomes effective, a petitioner is required to file a bond or deposit a fixed amount of legal tender with the prothonotary. Pa.R.C.P. 1531(b).

## B. Clear Right to Relief

In determining the petitioner's right to a preliminary injunction, it is essential that "the activity sought to be restrained is actionable, and that the injunction issued is reasonably suited to abate such activity. And unless the plaintiff's right is clear and the wrong is manifest, a preliminary injunction will generally not be awarded." *All-Pak Inc. v. Johnston,* 694 A.2d 347, 350 (Pa. Super. 1997), citing *Singzon v. Department of Public Welfare,* 496 Pa. 8, 436 A.2d 125, 127 (1981). To show a clear right to relief, the petitioner must show only that substantial legal questions must be resolved to determine the rights of the respective parties and need not prove the merits of the underlying claim. *Chmura v. Deegan,* 398 Pa. Super. 532, 535, 581 A.2d 592, 593 (1990). "[U]nlike a party seeking a permanent injunction, a party 'seeking a preliminary injunction is not required to establish his or her claim absolutely.' " *Boyle by Boyle v. Pennsylvania Interscholastic Athletic Ass'n Inc.,* 676 A.2d 695, 699 (Pa. Commw. 1996). (citation omitted)

The leases and testimony clearly show that 1930-34 Associates covenanted[4] to provide Dr. Elfman and Penn

---

4. The defendants do not argue that they are not bound by the covenants. 1930-34 Associates is liable as Berman's successor. See *Stone v. Marshall Oil Co.,* 188 Pa. 614, 41 A. 748 (1898) (stating that a covenant in a lease for the performance of some duty in connection

Fed with heat, elevator service, regular cleaning services and potable running water.[5] Dr. Elfman's lease contained an *express* covenant of quiet enjoyment of the leased premises. P-3, §37. Both plaintiffs' leases contained *implied* covenants of quiet enjoyment. *Lichtenfels v. Bridgeview Coal Co.,* 366 Pa. Super. 304, 309, 531 A.2d 22, 25 (1987). "The legal implication of the covenant, express or implied, is that the lessor will permit the tenant to enjoy fully the demised premises subject to any rights reserved to the lessor." *Checker Oil Co. of Delaware Inc. v. Harold H. Hogg Inc.,* 251 Pa. Super. 351, 358, 380 A.2d 815, 818 (1977) (en banc). Any wrongful act of the landlord—including denying access, withholding utilities, or altering the premises so as to make the property unsuitable for the purpose for which it was leased—that interferes with the tenant's possession is a breach of the covenant. *Lichtenfels,* 366 Pa. Super. at 309, 531 A.2d at 25; *Kuriger v. Cramer,* 345 Pa. Super. 595, 609, 498 A.2d 1331, 1338 (1955); *Pollock v. Morelli,* 245 Pa. Super. 388, 392-93, 369 A.2d 458, 460 (1976). "The impairment of the lessee's possession need not be

---

with the possession of the land runs with the laud). *Checker Oil Co. of Delaware Inc. v. Harold H. Hogg Inc.,* 251 Pa. Super. 351, 358, 380 A.2d 815, 818 (1977) (en banc) ("The burden of [an express or implied covenant of quiet enjoyment] runs with the land and thus passes to the transferee of the reversion or to the assignee of the landlord's interest in the lease."). 1930-34 Corporation is liable as the general partner of 1930-34 Associates. 15 Pa.C.S. §§8327, 8533(b). Though Turchi's exact role in these two companies is not clear, he is liable, at least, in his official capacity as the principal of 1930-34 Associates. Therefore, the court concludes that all of the Turchi defendants are liable under the leases.

5. The covenant to provide water is explicit in Penn Fed's lease and implicit in Dr. Elfman's lease.

total, but the utility of the premises must be substantially decreased by the landlord's interference with a right or privilege which is necessary to the enjoyment of the premises." *Checker Oil Co.,* 251 Pa. Super. at 358, 380 A.2d at 818 (same).

At the hearing, the plaintiffs clearly showed that the Turchi defendants breached the covenants to provide heat, elevator service, water and cleaning services. The plaintiffs clearly showed that the Turchi defendants breached the covenant of quiet enjoyment and constructively evicted the plaintiffs by changing the locks on the building, failing to provide essential services, willfully neglecting the building, failing to comply with the city code such that L&I shut down the building, and failing to take all steps necessary to remove violations of the code such that L&I will re-open the building. *Kelly v. Miller,* 249 Pa. 314, 317, 194 A. 1055, 1056 (1915) (holding that restricting access to leased premises is a breach of the covenant of quiet enjoyment); *Checker Oil Co.,* 251 Pa. Super. at 359, 380 A.2d at 818 (same). The plaintiffs are entitled to specific performance of these covenants. See *id.* (holding that tenant was entitled to mandatory permanent injunction enforcing the covenant of quiet enjoyment); *Emerman v. Baldwin,* 186 Pa. Super. 561, 569, 142 A.2d 440, 445 (1958) (a contract for the lease of real property is unique and may be the subject of specific performance).

The Turchi defendants assert no defense to liability on Penn Fed's claims. The Turchi defendants assert a single defense to liability on Dr. Elfman's claims: paragraph 7(c) of Dr. Elfman's lease. That paragraph reads:

"Lessor reserves the right, without liability to lessee and without constituting any claim of constructive eviction or any other claim, to stop or interrupt any heating, elevator, escalator, lighting, ventilating, cooling, gas, steam, power, electricity, water, cleaning or other similar or dissimilar service and to stop or interrupt the use of any building facilities at such times as may be necessary and for as long as may reasonably be required by reason of accident, strikes or the making of repairs, alterations or improvements, or inability to secure a proper supply of coal, gas, steam, water, electricity, labor or supplies, or by reason of any other similar or dissimilar cause *beyond the reasonable control of lessor*. No such stoppage, or interruption will entitle lessee to any diminution or abatement of rent or other compensation nor will this lease or any of the obligations of lessee be affected or reduced by reason of any such stoppage or interruption, *unless lessor fails to take appropriate measures to restore such services without undue delay*." Exhibit P-3, Elfman lease §7(c). (emphasis added)

This paragraph is no defense. First, the conditions that have caused the breaches of the leases are within the Turchi defendants' control. Second, even were they not within the Turchi defendants' control, the Turchi defendants have failed "to take appropriate measures to restore such services without undue delay."

At the hearing, the Turchi defendants also argued that Dr. Elfman is not entitled to enforcement of the lease because he knew the condition of the building and "did nothing to make arrangements to protect his practice." Dr. Elfman's knowledge of the breaches of the lease does not relieve defendants of their obligations under the lease.

To the extent that this argument is a defense of failure to mitigate damages, it must fail. Even were mitigation a defense to Dr. Elfman's claims, the Turchi defendants have offered no evidence that Dr. Elfman failed to mitigate damages. On the contrary, Dr. Elfman mitigated damages by finding temporary office space.

An injunction ordering the Turchi defendants to comply with the covenants is reasonably suited to abate the harm to the plaintiffs. The injunction will also bar the Turchi defendants from doing any residential conversion or other renovation work that will interfere with the plaintiffs' right to possession of the leased premises. The injunction, however, will not order that the plaintiffs be permitted access to the building prior to the lifting of the cease operations orders beyond any access currently allowed by the cease operations orders.

## C. Immediate and Irreparable Harm

In order to establish immediate and irreparable harm, a plaintiff has the burden of showing that the harm cannot be remedied by damages or that damages "can be estimated, only by conjecture and not by an accurate pecuniary standard." *West Penn Specialty MSO Inc. v. Nolan,* 737 A.2d 295, 299 (Pa. Super. 1999). In determining whether the harm in question can be remedied by damages, courts are to look not at past damage, but rather to "the unbridled threat of the continuation of the violation." *Id.* In addition, the harm in question must be great and irreparable. *Kimmel v. Lower Paxton Township,* 159 Pa. Commw. 475, 633 A.2d 1271 (1993).

In the absence of a preliminary injunction, Dr. Elfman will be unable to treat half of his patients, and he will be

required to refer those patients to other dentists. This threat of continued interruption of the relationship between a doctor and his patients constitutes an immediate and irreparable harm that cannot be remedied by damages. *West Penn Specialty MSO,* 737 A.2d at 299.

In the absence of a preliminary injunction, Penn Fed will suffer immediate and irreparable harm: it will be unable to fulfill its obligations to its membership.

## D. Restoration of the Status Quo

In granting a preliminary injunction, a court is required to "preserve the status quo, as it exists or previously existed before the acts complained of." *Smotkin v. Manhattan-Ward Inc.,* 363 Pa. Super. 597, 600, 526 A.2d 1223, 1225 (1987). The status quo to be preserved is "the last actual, peaceable and lawful noncontested status which preceded the pending controversy." *Valley Forge,* 493 Pa. at 501, 426 A.2d at 1129.

Here, the last noncontested status was the time that 1930-34 Associates' predecessor, Berman, was honoring his covenants in the leases. A return to the statue quo would requite the Turchi defendants to honor the covenants.

## E. Greater Injury in Refusing the Injunction

The plaintiffs must show that there would be greater injury resulting from failing to grant the injunction than from granting the injunction. *DiLucente Corp. v. Pennsylvania Roofing Co. Inc.,* 440 Pa. Super. 450, 456, 655 A.2d 1035, 1037 (1995). In considering any injuries, "[t]here should be no balancing of conveniences, but it

should be clear that greater injury would be done by refusing it than in granting it." *Pennsylvania Railroad Co. v. Driscoll,* 330 Pa. 97, 101, 198 A. 130, 133 (1938).

The Turchi defendants presented no testimony as to the harm they will suffer if the court grants the injunction. Furthermore, any harm that the Turchi defendants suffer will be monetary: the costs of fixing the building and providing required services. If the court does not grant an injunction, however, the injury to Dr. Elfman and Penn Fed will be substantial and will not be remediable by money damages.

### III. *The Court Sets Bond at $1,000 for Each Plaintiff*

An order granting a preliminary injunction must require the petitioner to file a bond with the prothonotary. Pa.R.C.P. 1531(b). In determining the amount of the bond, the trial court must balance the equities involved and "require a bond which would cover damages that are reasonably foreseeable." *Greene County Citizens United by Cumpston v. Greene County Solid Waste Authority,* 161 Pa. Commw. 330, 337, 636 A.2d 1278, 1281 (1994). The bond need not cover all possible damages. *Christo v. Tuscany Inc.,* 368 Pa. Super. 9, 20, 533 A.2d 461, 467 (1987). The court may consider, among other factors, the defendants' failure to establish their possible loss, the plaintiffs' ability to pay, and the likelihood of actual damage to the defendants. *Id.* at 19-20, 533 A.2d at 466-67; *Broad and Locust Associates v. Locust-Broad Realty Co.,* 318 Pa. Super. 38, 44, 464 A.2d 506, 509 (1983).

The preliminary injunction will require the Turchi defendants, at the very least, to clean up the garbage,

provide a regular cleaning service, fix the pump, cover the water tank, certify the sprinklers, turn on the heat, provide the plaintiffs with keys, and perform other tasks. The Turchi defendants—all of whom knew about and were noticed or subpoenaed to appear at the hearing—failed to appear at the hearing and failed to offer any evidence about the anticipated cost of performing these tasks. The Turchi defendants failed to offer any credible reason why they are not obligated to perform these tasks. Considering these factors and balancing the equities, the court determines that a bond of $1,000 from each plaintiff will be sufficient to cover reasonably foreseeable damages.

## IV. *The Court Denies the Request for Interim Financial Relief*

The plaintiffs propose that the court award interim financial relief for extra expenses that they are incurring as a result of the Turchi defendants' conduct. There has been no testimony as to the amounts of such expenses. The court denies the request without prejudice to the plaintiffs to seek reimbursement for these expenses as part of their damage claims. However, the court will impose a 10-day deadline on the Turchi defendants to comply with the court's order. For each day beyond the 10 days that the Turchi defendants have not complied with the order, they shall pay a fine of $500 to each plaintiff.

## V. *The Court Denies the Request for Counsel Fees*

The plaintiffs ask the court to award them counsel fees under 42 Pa.C.S. §2543. This statute provides that a court

may award "counsel fees as a sanction against another participant for dilatory, obdurate or vexatious conduct during the pendency of a matter" or for "conduct of another party in commencing the matter or otherwise was arbitrary, vexatious or in bad faith." 42 Pa.C.S. §2503(7) and (9). The plaintiffs base their request on the Turchi defendants' failure to offer a meritorious defense to the plaintiffs' claims that the defendants violated the lease and failed to comply with Dr. Elfman's subpoena. The court cannot conclude at this time that the Turchi defendants' conduct was dilatory, obdurate, vexatious, arbitrary or in bad faith. The court denies the request for counsel fees.

## CONCLUSIONS OF LAW

(1) Dr. Elfman has a right to remain in his office until June 30, 2003.

(2) Penn Fed has a right to remain in its office until September 30, 2004.

(3) The change in the building's ownership does not affect the plaintiffs' rights under the lease.

(4) The Turchi defendants owe the plaintiffs a duty to comply with the terms of the leases, including a duty to supply potable running water, elevator service, heat and cleaning services.

(5) The Turchi defendants covenanted to provide the plaintiffs with quiet enjoyment of the leased premises. This covenant includes a duty to provide full-time access to the leased premises, a duty to comply with the City of Philadelphia Code and a duty to take all steps

necessary to remove the violations cited by the cease operations orders such that the building is re-opened.

(6) The Turchi defendants have breached and continue to breach these duties.

(7) The Turchi defendants have constructively evicted the plaintiffs.

(8) The plaintiffs have a clear right to specific performance of these covenants.

(9) The plaintiffs will suffer imminent, irreparable harm not compensable by monetary damages if defendants continue to breach these duties.

(10) Greater injury will occur from denying the preliminary injunction than from granting it.

(11) A preliminary injunction will restore the parties to the status quo.

(12) A preliminary injunction ordering the Turchi defendants to comply with the lease is reasonable to abate the harm to the plaintiffs.

## CONCLUSION

On the basis of the record, the court will enter a contemporaneous order granting the plaintiffs' petition for a preliminary injunction. The portion of the order granting Penn Fed's petition is conditioned on Penn Fed's filing additional bond or legal tender of $1,000 with the prothonotary within five days of the entry of this order. *Id.* Dr. Elfman has already posted $1,000 bond and he need not post additional bond.

The Turchi defendants shall have 10 days after the entry of the order to have the building re-opened and other-

wise comply with the order. For each day after the expiration of the 10 days that the building remains closed and the Turchi defendants otherwise fail to comply with the order, the Turchi defendants shall pay a fine of $500 per day to each plaintiff.

## ORDER

And now, May 8, 2001, upon consideration of the plaintiffs' petitions for preliminary injunction, the defendants' responses, the hearing and oral argument and all relevant documentation, and in accordance with the court's contemporaneously-filed opinion, it is hereby ordered that the petitions are granted. It is further ordered that

(1) Turchi, 1930-34 Associates and 1930-34 Corporation shall repair the water system at 1930 Chestnut Street so that plaintiffs have a supply of safe, potable running water.

(2) The Turchi defendants shall fix any defects in the sprinkler system and have that system certified by a licensed professional.

(3) The Turchi defendants shall supply heat for the building from October 10 until May 20 of each year.

(4) The Turchi defendants shall remove all garbage and debris from the common areas of the building, including trash blocking the stairways and exits.

(5) The Turchi defendants shall maintain at least one working elevator at all times and shall supply that elevator with a working communications system.

(6) The Turchi defendants shall provide daily cleaning service to the common areas of the building and the leased premises.

(7) The Turchi defendants shall give the plaintiffs keys to the front door of the building and shall give the plaintiffs and their employees full-time access to the building.

(8) The Turchi defendants shall provide access for plaintiffs' patients and visitors Monday through Friday from 8 a.m. to 8. p.m. and Saturday from 8 a.m. to 4 p.m.

(9) The Turchi defendants shall remedy all violations identified in the cease operations orders and shall make all efforts to have the cease operations orders lifted and the building re-opened.

(10) The Turchi defendants shall not do any residential conversion or other renovation work that deprives the plaintiffs in any way of the use of the leased premises.

(11) The Turchi defendants shall have complied with the terms of this order, including securing the lifting of the cease operations orders and the re-opening of the building, within 10 days of the entry of this order. On the eleventh day after the entry of this order, the Turchi defendants shall pay a daily fine of $500 to each plaintiff. The Turchi defendants shall hand-deliver the accumulated fines for each week (Sunday through Saturday) to counsel for each plaintiff by 4:30 p.m. on the Monday immediately following that week. The fine shall be in the form of a certified check. Once the building is re-opened and the Turchi defendants have otherwise com-

plied with this order, the Turchi defendants shall petition the court to stay the fine.

(12) In the event any daily fine is paid as provided in paragraph 11 of this order, the Turchi defendants may seek an increase in the amount of the bond and the court will immediately address the request.

(13) Dr. Elfman shall maintain the $1,000 bond that he already posted.

(14) Penn Fed shall file a bond or deposit legal tender of $1,000 with the prothonotary in accordance with Pa.R.C.P. 1531(b) within five days of the entry of this order.

(15) Plaintiffs' requests for interim financial relief and counsel fees are denied.